### In re L. VAN BOKKELEN, Inc.

#### No. 6233.

District Court, D. Maryland.
June 28, 1934.

Malcolm H. Lauchheimer, of Baltimore, Md., for trustee.

Neil P. Cullom, of New York City, for claimant Grace E. Lowendahl.

Herbert M. Brune, Jr., of Baltimore, Md., Davis, Polk, Wardwell, Gardiner & Reed, of New York City (by Edward C. McLean, of New York City), for claimant Royal Baking Powder Co.

Patterson, Eagle, Greenough & Day, of New York City (by Carroll G. Walter, of New York City), for claimants Charles Auguste Kennerly-Hall, Kenneth Stirling, and National Cold Storage Co.

## WILLIAM C. COLEMAN, District Judge.

There are four claims filed against the bankrupt estate which the court in the present proceeding is called upon to examine, and to determine whether any of them should be allowed in whole or in part: (1) The Royal Baking Powder Company; (2) Charles Auguste Kennerly-Hall and Kenneth Stirling (joint claimants); (3) the National Cold Storage Company; and (4) Grace E. Lowendahl, being the claimants who have filed these claims. The first three claims were heard by the referee, the late Willis K. Myers. A large amount of testimony was taken before him, but he died before rendering an opinion as to the allowance of these claims. The fourth claim, namely, that of Grace E. Lowendahl, the referee allowed in a formal opinion, and signed an order pursuant thereto. All claimants, as well as the present referee (due to his possible disqualification to pass upon one of the claims), have asked the court to pass upon all of the claims without further reference to a referee.

At the outset, a brief statement respecting the character and amount of the various claims is proper. The claim of the Royal Baking Powder Company amounts to $116,-287.11, with interest, from April 1, 1931, being founded upon a demand note of Libertus Van Bokkelen, indorsed by Walter Van Bokkelen, dated January 18, 1929. The note was originally for $150,000, representing a loan to Libertus for use in his business. Thereafter, various payments were credited to the note, thus reducing the amount of the claim to the above figure.

The claim of Kennerly-Hall and Stirling is in the amount of $125,000, with interest from February 4, 1929, to March 13, 1931, based on a note dated February 4, 1929, of Libertus Van Bokkelen and indorsed by Walter Van Bokkelen, due February 4, 1930, as extended. The consideration for this obligation does not appear in the proof of claim.

The claim of the National Cold Storage Company is for $16,726.99, with interest from April 24, 1929, to March 13, 1931, based upon a claim for storage and handling charges on certain merchandise alleged to have been incurred for the account of Libertus Van Bokkelen at various times.

Lastly, the claim of Grace E. Lowendahl, amounting to $222,594.12, is based upon a judgment obtained by her against the present bankrupts in the Supreme Court of the state of New York and entered on March 16, 1931.

The first three of these claims will be considered together, to the extent that the same questions arise with respect to each of them. It is undisputed that Libertus Van Bokkelen in his lifetime was indebted to these claimants in the amounts set forth in their proofs of claim. However, the trustee objects to the allowance of these claims on the ground that (1) they are based on the liability of a predecessor of the bankrupt, and not of the bankrupt itself; and (2) that they constitute a tort liability, not reduced to judgment prior to the filing of the petition for adjudication. Briefly stated, these claimants contend that the sale by Walter Van Bokkelen to a successor corporation, the present bankrupt, as hereinafter explained, of certain assets of the business formerly belonging to his brother Libertus, was a fraud upon them.

It appears that Libertus Van Bokkelen, a citizen of the United States, conducted an unincorporated importing and exporting business in South America, where, on February 9, 1929, he died, and the business descended, under Argentine law, to certain of his relatives, from whom, in August, 1929, by bill of sale, Libertus Van Bokkelen's brother,

Walter Van Bokkelen, acquired, as appears to be conceded by all the parties to this proceeding, the business, and, as we interpret that document, assumed its liabilities. On October 1, 1929, a corporation (the present bankrupt) was formed, into which the Baltimore & Ohio Railroad Company, through a subsidiary, the New York Terminal & Transit Company, invested $500,000 in cash, in exchange for which it took preferred stock, plus a bonus of common stock, hereinafter referred to. This corporation, under an agreement of November 1, 1929, to acquire certain of the assets of the business from Walter, paid him approximately $150,000 of the $500,000 for the tangible assets, and approximately $125,000 for a 51 per cent. interest in the Van Bokkelen subsidiary, a South American concern called Van Bokkelen and Rohr, and common stock was given for the intangible property. Under a separate agreement between Walter Van Bokkelen and the railroad, a majority of the common stock of the newly formed corporation, namely, 15,-300 shares, was issued to the railroad as a bonus in consideration of its investment, in this newly formed corporation, of the $500,-000 above referred to. After the $275,000 just mentioned had been paid by the corporation to Walter Van Bokkelen for the tangibles and the 51 per cent. interest in the Van Bokkelen subsidiary, the remaining $225,000 was used for working capital. In a suit brought in New York by Grace E. Lowendahl (whose claim in the present proceeding has already been referred to and which will be separately considered in this opinion), the New York courts held that this same transfer was in fraud of the creditors of Libertus and Walter Van Bokkelen, and thereupon gave plaintiff judgment for her claim, declaring the transfer null and void. Lowendahl v. L. Van Bokkelen, Inc., 139 Misc. 857, 248 N. Y. S. 553, affirmed without opinion by the Appellate Division, 234 App. Div. 749, 254 N. Y. S. 917; and by the New York Court of Appeals, 260 N. Y. 557, 184 N. E. 90. This judgment, however, does not make the question of the validity of the claims of the three other creditors with whom we are immediately concerned res adjudicata, because the suit in New York was not between the same parties.

It is contended by the claimants that under the agreement of November 1, 1929, the new corporation became a mere continuance of the old business. As evidence of this, it is pointed out that the new corporation, Libertus Van Bokkelen's estate, and Walter Van Bokkelen all had the same attorney and that the latter became president and director of the new corporation, at a salary of $25,000, and that the administrator of Libertus' estate became manager of the corporation's New York office. However, unless there was fraud or lack of proper consideration in the transfer, it does not follow that the corporation in acquiring the assets of the old business thereby necessarily assumed its liabilities. The agreement of transfer by its language indicates that the liabilities were not intended to be assumed. The agreement provides (paragraph No. 2): "The said business shall be liquidated by the said Van Bokkelen and in this liquidation thereof and for the purposes of this agreement, all completed transactions shall be treated as the business of Van Bokkelen, and all money in hand derived therefrom and bills receivable and accounts receivable and all payments due and to become due, and *all liabilities* in respect thereof, shall be retained or liquidated by said Van Bokkelen." (Italics inserted.) Further, the last paragraph of the agreement (paragraph No. 4) provides: "Van Bokkelen covenants with the Corporation that he has acquired from the estate, heirs and personal representatives of his brother, L. Van Bokkelen, deceased, lawful title to all the merchandise, good will, and property, which he has sold and agreed to sell by this agreement, and that he has lawful right to sell the same free from all liens, claims and liabilities to the extent provided in this agreement."

Thus, considering the agreement by itself, there is no support for the contention that the corporation assumed the debts of its predecessors. We, therefore, must now turn to a consideration of the question whether the record in the present bankruptcy proceeding discloses facts sufficient to sustain claimants' charge of fraud. The burden of proving this is upon the claimants.

After a careful examination of the voluminous record before the referee, and the briefs which were submitted to him as well as to the court, we reach the conclusion that claimants have failed to sustain this burden of proof which rests upon them. There is no proof that the tangible assets of the old business, plus the 51 per cent. interest in the subsidiary company known as Van Bokkelen and Rohr, were worth more than $275,000 which the newly formed corporation paid Walter Van Bokkelen for them. Before the Baltimore & Ohio Railroad Company entered into the situation, the business as conducted by Walter Van Bokkelen, was financially weak. Afterwards, Walter Van Bokkelen had $275,-000 in cash and approximately one-half in-

terest in a new and financially healthy business. He also retained the receivables of the old business, which, shortly before the transfer, had been valued by trustworthy accountants at some $455,000. It is true that Walter Van Bokkelen's stock in the newly formed corporation eventually turned out to be worthless, because the corporation became bankrupt some sixteen months after it was formed, and that the receivables eventually proved to be practically uncollectible; also, that none of the $275,000 which Walter received from the corporation was ever paid to any of the present claimants, but was distributed to other creditors of Walter Van Bokkelen. However, we still fail to find that the transfer by Walter Van Bokkelen to the corporation was in fraud of the creditors of himself and his brother Libertus, at the time the transfer was agreed upon, namely, November 1, 1929, which was the peak of the financial boom.

■ Referring now, somewhat more specifically, to a feature peculiar to the claim of the Royal Baking Powder Company, with particular reference to the contention of that company that the newly formed corporation assumed the debt represented by the demand note and the contract dated January 18, 1929, we find that whereas the contract recited the fact that Libertus had the South American agency for the Royal Baking Powder Company, the contract did not bind either party to a continuation of the agency, nor did the contract, which was collateral to the agency, make the agency dependent upon the performance of the contract. That is to say, it was entirely consistent with the contract that the rights and obligations involved in the agency might be taken over by the corporation, without the corporation being bound by the contract. Thus, the mere fact that the corporation became the South American agent for the Royal Baking Powder Company did not bind the corporation to the contract of January 18, 1929, or to the note made pursuant thereto. The $150,000 lent by the Baking Powder Company to Libertus on his note was not lent to the corporation. It is true this loan may have preserved the assets acquired by the corporation from Walter Van Bokkelen, but such benefit is too remote in time and indirect in effect to enable us to imply an obligation on the part of the corporation to pay the note. It is further contended that the corporation assumed the obligation, because the contract provided that the Baking Powder Company could apply any commissions payable by it to Libertus Van Bokkelen towards the repayment of the $150,-

000 borrowed on the note, and commissions were so credited pursuant to an understanding which responsible officials of the Baking Powder Company allege existed between them and Walter Van Bokkelen, but which he denied. In any event, since Walter Van Bokkelen had no authority to bind the corporation to pay a collateral debt arising out of a completed transaction (that is to say, the loan of $150,000 on the note) which took place more than nine months before, any acquiescence on the part of the corporation would appear to be limited to the benefit actually received by it. It further appears that as soon as the railroad's representatives in the corporation learned that the commissions were being credited against Walter's liability, they objected, with the result that the agency contract was forthwith terminated by the Baking Powder Company.

■ The Royal Baking Powder Company further contends that certain provisions of the Argentine Code (sections 33 and 220) required the corporation as its agent to disclose any facts of such a nature as would influence a revocation of the agency. But suffice it to say that the corporation, as long as it had no knowledge of the terms under which the commissions were being credited, could hardly be bound to disclose that it would not consent to such an arrangement when it learned about the arrangement. The Royal Baking Powder Company further claims that since the contract of January 18, 1929, provided for the formation of a corporation, it is to be taken as the same corporation that was contemplated by the contract. In view of what has already been said, it becomes unnecessary to answer this contention further, other than to say that the new corporation was formed primarily to handle produce, and not primarily proprietary articles which was what the Baking Powder Company had originally desired, and as a result, the Baking Powder Company not only did not approve of the formation of the new corporation, but knew nothing about it until it had been formed. It is true that Walter Van Bokkelen had been general manager of the old business and became president, general manager, director, and large stockholder of the new corporation. However, Walter's interests with respect to the debts in suit were antagonistic to those of the corporation, and thus knowledge possessed by Walter cannot be imputed to the corporation. He was interested in having commissions due the corporation credited against the debt, while it was to the corporation's interest to receive the commissions, and as soon as the crediting of

644

these commissions became known to others than Walter in the corporation, this practice was terminated. An agent's knowledge will not be imputed to his principal, where the agent's interests are antagonistic to those of his principal. Lohmuller Building Co. v. Gamble, 160 Md. 534, 154 A. 41.

The ▮▮▮ Baking Powder Company stresses three letters alleged to have been written by officers of the corporation and received by the Baking Powder Company, upon which, as it asserts, it relied, and claims they are indicative of the corporation's having assumed the liabilities as well as the assets of the old business. The first of these letters, dated December 3, 1929, was of the circular variety, sent to customers of the old business and signed by Mr. George M. Shriver, Jr., treasurer of the corporation. This letter is, in effect, a business announcement with an implied invitation to customers. It is not to be construed as an acknowledgment of liability, even though it states that the new company "has acquired the business" of the old one, because its terms are much too general. The second letter, dated December 19, 1929, signed by Thomas F. Hudson, manager of the South American business of the new corporation, bearing the letterhead, to be sure, of the old business, is merely a statement that the stock in trade of the old business had been taken over by the new. Liability cannot be predicated upon this correspondence. It is true the third letter, dated October 14, 1929, but not mailed until some time in January, 1930, and signed with the name of Walter Van Bokkelen, stated unequivocally that the corporation "has taken over all of the assets and liabilities of the old business." Suffice it to say that this letter was actually written before, though not delivered until after, the contract was made for the purchase of the assets of the old business by the new corporation, that is, before November 1, 1929, and that in any event its contents should not be allowed to vary the terms of the formal contract unless there is clear evidence that such was the intent of the parties to the contract, especially when it was signed by an official of the corporation whose interests, as heretofore explained, were contrary to those of the corporation itself.

Reverting again to a more general consideration of the Royal Baking Powder Company's claim, as well as the claims of Kennerly-Hall and Stirling and the National Cold Storage Company, we cannot lose sight of the fact that the corporation existed for some sixteen months, in the course of which new creditors arose. Their interests cannot lightly be set aside in favor of preincorporation debts, created by a promoter of the corporation, but expressly excluded from the agreement transferring certain assets from the promoter to the corporation; debts, furthermore, the consideration for which resulted in no direct benefit to the corporation. It is further significant, although not tantamount to a waiver, election of remedies, or estoppel, that none of these creditors took steps during the life of the corporation to assert their claims against it, although they all proceeded against Walter Van Bokkelen and got judgment against him. Also we find that the present claimants refused to participate in the suit brought in New York by Grace E. Lowendahl, and that it was only after favorable findings in that suit that these claimants endeavored to be made parties to it in order to obtain the benefit of the judgment.

There remain to be considered in more detail the facts surrounding the transfer of the business, as they may bear upon the charge of fraud.

As we have seen, under the terms of the contract of November 1, 1929, Walter Van Bokkelen was allotted the entire issue of 30,-000 shares of common stock; that is, he became the owner of the entire business, over and above the equity represented by the preferred stock. In addition, he had an equity in the cash equivalent of the tangibles, plus the cash equivalent of a 51 per cent. interest in the subsidiary company, Van Bokkelen & Rohr. The board of directors of the new corporation valued the assets at $3,000,000. From this it is argued that the consideration paid was grossly inadequate. However, if the assets were worth $3,000,000, Walter Van Bokkelen's 30,000-share interest was worth considerably more than his alleged liabilities of about $865,000, and even the 14,700 shares which he retained after the issuing to the Baltimore & Ohio subsidiary of 15,300 shares were worth conservatively in excess of $135,-000, which makes up for any "spread" between his personal assets and personal liabilities as of November 1, 1929, the date of the agreement of purchase, as hereinafter explained.

We must consider the effect of this purchase not only upon the financial condition of Walter Van Bokkelen, but upon the estate of his brother Libertus as well, because the claims here in suit were claims primarily against Libertus. Upon his death they became claims against his estate; and when his brother Walter acquired the business from the estate, he, Walter, became liable upon the obligation by assumption. If he had been

called upon to meet the obligations, he would have thereafter been subrogated to the present claimants' rights against the estate. Thus the combined assets of Walter Van Bokkelen and the estate of his brother Libertus, represented the fund out of which the debts had to be met. Hence, any dispute as to whether certain assets belonged to one or the other, as for example the question which is raised over certain produce on hand, becomes immaterial.

In addition to the probable value of the stock which Walter Van Bokkelen received by reason of the sale of certain assets, there is also to be taken into account the value of the receivables of the business which he retained. These appear to have been worth at least $455,000. The fact that they were never ultimately collected is not conclusive, if the value thus placed upon them, as of November 1, 1929, has a reasonable basis in fact as of that date. When we add to these the $275,-000 cash equivalent of the assets sold by Walter Van Bokkelen to the corporation, we find his total assets to have been approximately $730,000, as against liabilities of approximately $865,000, or an excess of liabilities over assets of $135,000. We find that the 14,700 shares were worth at least this amount. Hence, Walter Van Bokkelen was not insolvent on November 1, 1929, when the transfer occurred.

The finding that Walter Van Bokkelen was solvent on November 1, 1929, is directly contrary to the finding (No. 29) of the New York court in the proceedings already referred to. But we believe that an examination of the findings of the New York court will immediately disclose their inaccuracy in material respects. For example, finding 29 states that on November 1, 1929, the liabilities of Walter Van Bokkelen aggregated about $490,000, and that his assets consisted of cash in the sum of $245, and no stocks, bonds, or real estate of any substantial or realizable value. This statement is apparently incorrect, whether it be interpreted as referring to the moment before, or the moment after, the transfer of certain of the assets by Walter to the corporation under the contract of November 1, 1929. If before, it overlooks the presence, among Walter's assets, of the tangibles and intangibles of the old business. In finding 27, the New York court held that the intangibles, such as good will, accounts, trademarks, trade-names, list of customers, and agency agreements, "all possessed great value." How great is only indicated by the reference in finding 17, to the effect that the assets of the whole business were valued by the board of directors of the corporation at $3,000,000. Whatever the intangibles were worth, they were transferred to the corporation by Walter, in exchange for stock in the corporation. This latter fact throws into relief another inaccuracy in finding 27 where it is stated that nothing was paid by the corporation to the seller for the intangibles listed.

If the statement in finding 29 be taken to refer to the moment after the sale of November 1, 1929, it is still inaccurate in overlooking the fact that Walter did own stock in the corporation; that this stock had been given Walter in exchange for the intangibles which were stated (finding No. 27) to be of great value; that whatever value attached to the intangibles attached to the stock received by Walter; and that if the intangibles were of "great value" the stock must have been of "great value" also.

Findings 29 and 30 are misleading in giving the impression that the assets and liabilities of Walter, and the assets and liabilities of the estate of Libertus, can be considered separately in determining the solvency of each. As pointed out above, all the liabilities considered in these proceedings were liabilities of both Walter and the estate. The assets of both constituted the fund out of which the liabilities were to be met. The New York court seems to have fallen into the error of counting the liabilities twice, and of not counting some of the assets at all in findings 29 and 30 on the issue of solvency, although attaching "great value" to certain of the assets; namely, the intangibles in finding 27.

More specifically, the $490,000, taken as the amount of Walter's liabilities in finding 29, consisted of the approximate sum of the four claims here involved. The $750,000 taken as the amount of the liabilities of the estate of Libertus Van Bokkelen in finding 30, consisted of the approximate sum of the four claims, plus the figure of about $275,000 which Walter received for the tangibles of the old business and the 51 per cent. interest in Van Bokkelen & Rohr, and which in turn Walter paid over to creditors of the old business other than the present claimants. The difference between the figure of $750,000, adopted by the New York courts as the total amount of liabilities, and the figure of $865,000, adopted by this court as the total amount of liabilities, is probably due to the fact that in the latter figure we have included the claim of the Corn Products Company for some $108,000, which has been settled.

As previously pointed out, on account of the joint obligation of Walter and the estate on the various liabilities which have been considered by this court, and which were considered by the New York courts, the combined assets of Walter and the estate must be balanced against the combined liabilities, to determine the solvency or insolvency of Walter and the estate. When this is done, giving reasonable value to the intangibles before the contract of November 1, 1929, was made, and reasonable value to the stock after it was made, and taking into account the cash value of the tangibles and a reasonable valuation of the receivables on November 1, 1929, there seems to be an adequate margin of the combined assets over the combined liabilities. This being so, this court feels justified in reaching a conclusion contrary to findings 29 and 30 of the New York court.

At this point, notice should be taken of the case of Strongin v. International Acceptance Bank, Inc. (C. C. A.) 70 F.(2d) 248, in which the bankruptcy of Walter Van Bokkelen was involved. There the United States Circuit Court of Appeals for the Second Circuit concluded, in deciding questions with which we are not concerned, that the bill of sale of August 9, 1929, heretofore mentioned, effected, not a sale of the old business to Walter, but merely a convenient business arrangement under which he acted as agent for the true owners (that is, distributees upon the death of Libertus). This contention was not pressed by any of the claimants in the present suit, nor in the case in the New York courts. Even if it were true that the bill of sale of August 9, 1929, conveyed no beneficial interest to Walter, that would not affect the result in the case now before the court. For if Walter be deemed to have acted merely as agent of the owners of the estate (that is, the widow, the mother, and perhaps the father of Libertus), then the question would be the same; that is whether the sale of certain of the assets by the estate (as undisclosed principal) to the corporation had been fraudulent. In other words, was the estate insolvent at the time of the contract of November 1st? The same liabilities and the same assets would be involved as have been discussed above, in determining the combined financial condition of Walter and the estate. The conclusion would therefore be the same, namely, that the estate was solvent on November 1, 1929; and that the sale to the corporation was not in fraud of the creditors of the estate.

It follows from what has been said that claimants have failed to sustain the burden of proving that the corporation did not give fair value for what it received under the contract of November 1, 1929. Thus, not only was there no tort committed by the corporation as a result of the conveyance to it (a claim for which would be unprovable); but there was no unjust enrichment upon which to base an implied contract obligation (a provable claim under Bankr. Act § 63a (4), 11 USCA § 103 (a) (4), if it existed).

▬ It is argued that the New York Bulk Sales Act (New York Personal Property Law [Consol. Laws, c. 41] § 44) governs the transfer, and that since the provisions of that statute were not complied with the transfer must be set aside. However, it is clear that the New York statute is inapplicable to the present case. Passage of title is governed by the law of the situs of the assets which, in the present case, was Buenos Aires. The law of the place of contracting, that is, the place where the agreement for the transfer of the assets was made (which, in the present case, was New York), is not controlling. See Restatement, Conflict of Laws (Final Draft) §§ 276 and 277. Buenos Aires was the headquarters of the business, and the assets, both tangible and intangible, were there, with the exception of a few hundred dollars worth of office furniture located in New York, to which, it may be conceded, without having any material effect upon the situation, the New York statute is applicable. There is no proof in the present case of any Bulk Sales Act being in effect in the Argentine Republic at the time here involved.

In view of the detailed analysis which we have made of the facts and the conclusion which we here reach, it becomes unnecessary to analyze in detail the cases upon which claimants specially rely, as for example, In re Super Trading Co. (C. C. A.) 22 F.(2d) 480, and Wiggins Ferry Co. v. O. & M. R. Co., 142 U. S. 396, 12 S. Ct. 188, 35 L. Ed. 1055. Suffice it to say that there are facts in those cases clearly distinguishing them from the present situation.

There are various other points raised by counsel for the respective claimants which we have not attempted to review, because we believe them to be relatively immaterial, or at least not of such character as to offset the major considerations which we have herein analyzed, and upon which we base our decision.

There remains to be considered the claim of Grace E. Lowendahl which is based upon grounds different from those of the other three claims just reviewed. That is to say,

it is based upon a judgment obtained in a suit by Mrs. Lowendahl as assignee of a creditor of Libertus and Walter Van Bokkelen against the present bankrupt corporation, on the ground that the corporation had fraudulently acquired the assets formerly belonging to these parties. Reference has already been made to this suit, and it has been pointed out that the findings therein are not res adjudicata in the present case. With respect to the other three claims considered, our findings are diametrically opposed to those of the New York court on the question of the validity of the transfer by Walter Van Bokkelen to the present bankrupt corporation. Nevertheless, we have given the most careful consideration to that decision to which, of course, it is entitled. It is a matter of regret that both of the New York appellate courts, in affirming the judgment of the lower court, did so without filing any opinion. But regardless of this fact and of our failure to agree with the conclusion reached by the New York courts, we would, of course, be compelled, under the full faith and credit clause of the Constitution, to give full recognition to the judgment there obtained and relied upon by Mrs. Lowendahl as the basis of her claim in the bankruptcy proceeding in this court, if, as a matter of fact, such judgment were obtained prior to the filing of the petition in bankruptcy in this court.

▌ Stated somewhat differently, the first question presented by the Lowendahl claim is whether it is provable as a "fixed liability, as evidenced by a judgment * * * absolutely owing" at the time of the filing of the petition in bankruptcy by the corporation, in accordance with the provisions of section 63a (1) of the Bankruptcy Act, 11 USCA § 103 (a) (1). In his opinion, the late Mr. Myers, then referee, answered this question in the negative. In this we find that he was correct because on March 13, 1931, the date when the petition for adjudication was filed, there was in fact no judgment existing against the corporation in New York. The judgment was entered on March 16, 1931; that is, three days later. But on April 1, 1931, the New York court, upon being advised that, by the bankruptcy proceeding, fraud was attempted to be practiced upon creditors of the corporation, passed an order directing that the judgment be entered nunc pro tunc, as of March 12, 1931. But the assets of the bankrupt had already come under the jurisdiction and control of this court, and a comprehensive lien had attached to all of them in favor of the trustee in bankruptcy for the benefit of the then existing creditors;

that is to say, the claimants with provable claims at that time. Thus Mrs. Lowendahl had no in rem right on March 13th, because she could not then have asserted an interest in the assets. A court of a foreign jurisdiction could not create another in rem right which would result in a proportionate reduction of all the in rem rights that had been previously created. By this we are not to be understood as suggesting that the New York court could not render a judgment nunc pro tunc in the New York proceeding. With such a question this court has no power or concern. Our conclusion is simply that no effect can be given to the New York nunc pro tunc judgment of April 1, 1931, if the result would be to create a new in rem right at the expense of in rem rights already created. That is to say, the nunc pro tunc order of the New York tribunal is entirely valid as between Mrs. Lowendahl and the defendant corporation, but it is beyond the power of this court to permit that order to affect the rights of other creditors of the bankrupt that had already been fixed by prior proceedings in the bankruptcy court here. Thus no collateral attack is here being permitted upon the New York judgment; nor is there any refusal to extend the same faith and credit to the New York judgment that should be extended to it in New York if similar conditions existed. See In re Kroeger Bros. Co. (D. C.) 262 F. 463.

▌ Although the referee reached the proper conclusion with respect to the effect of the nunc pro tunc judgment of the New York court, he nevertheless erred in allowing the claim on a different ground, namely, that it was provable as a "fixed liability, as evidenced by * * * an instrument in writing, absolutely owing at the time of the filing of the petition" in bankruptcy by the corporation, pursuant to the provisions of section 63a (1) of the Bankruptcy Act (11 USCA § 103 (a) (1). The referee held that the findings of fact and conclusions of law made by the New York court on March 10, 1931, that is, three days before the filing of the voluntary petition in bankruptcy, constituted an "instrument in writing, absolutely owing at the time of the filing of the petition" against the corporation, within the provisions of the above section of the Bankruptcy Act.

With this we cannot agree. We believe that the findings of the New York court constituted neither "an instrument in writing," as that phrase is used in this section of the Bankruptcy Act, nor did they evidence any liability "absolutely owing" on March 13th. No suit could have been brought on these find-

648

ings then or on any later date, unless and until formal judgment had been entered. They did not present a situation similar to that of a debt owing, but not yet payable, because they were entirely preliminary to a judgment and did not themselves constitute, nor were they the equivalent of, a judgment. Judgment might have been postponed indefinitely, in which case no right would ever have been created in favor of the plaintiff against the defendant.

There is a basic similarity as far as lack of finality is concerned, between a verdict, on the one hand, and the findings of fact and conclusions of law of the New York court on the other. Both are subject to the control and discretion of the court, and may be superseded altogether, prior to entry of judgment. No action can be maintained on either. No interest runs on the basis of either, and no determinative character is impressed upon either until the court has pronounced its judgment that the plaintiff recover from the defendant. Such were the controlling factors in the decision of Black v. McClelland, 3 Fed. Cas. 504, No. 1,462, in which it was held that a verdict was not equivalent to a judgment within the terms of the Bankruptcy Act of 1867. In re Ostrom (D. C.) 185 F. 988, 26 A. B. R. 273, reiterated the same reasoning and result in respect to section 63a (1) as phrased in the present Bankruptcy Act.

There remain to be considered three other questions, however, before concluding that the Lowendahl claim must be disallowed. These questions are: First, was there any fraud upon this court, under the Bankruptcy Act, involved in the corporation's timing the filing of its petition in bankruptcy with the admitted intention of rendering the Lowendahl claim unprovable, it being also admitted that the Lowendahl claim was founded on a tort. Second, even assuming there was such fraud, may it be invoked in the present litigation, or has Mrs. Lowendahl, by reason of having filed a claim in the bankruptcy proceeding, acquiesced in the adjudication; or in other words, has there been an election by waiver of one of two inconsistent remedies; and, third, was there collusion, as is alleged, between the bankrupt corporation and the Royal Baking Powder Company, creditor, and others in the procuring by them of the order to show cause, which stayed the formal entry of the judgment by the New York court, thus causing that court to "mark time," while the corporation took the necessary steps to procure a voluntary adjudication in bankruptcy?

The first of these three questions we must answer in the negative. At most, what occurred in the present case was a collusive scheme to benefit under the Bankruptcy Act by going into bankruptcy to prevent a lessening of the distributive share of existing creditors in the bankrupt's assets, which lessening would have taken place if the prospective judgment creditor, Mrs. Lowendahl, had been allowed to procure formal entry of judgment before the voluntary petition had been filed. It is true that here the largest creditor of the bankrupt was the largest stockholder, namely, the New York Terminal and Transit Company, and that the voluntary petition in bankruptcy was procured by that company to protect its interests as a creditor. However, this is not the sort of collusion which is forbidden. Compare In re Moench & Sons Co. (C. C. A.) 130 F. 685; Id. (D. C.) 123 F. 965; Home Powder Co. v. Geis (C. C. A.) 204 F. 568; In re Syracuse Stutz Co. (C. C. A.) 55 F. (2d) 914. If it be legal for a creditor to be instrumental in throwing a corporation into bankruptcy for the purpose of thwarting an imminent judgment lien, why should it not be legal for a creditor, as in the present case, to be instrumental in putting a corporation into bankruptcy for the purpose of cutting out an imminent provable claim? In both situations the creditor merely preserves the status quo. In both, the party with the threatening claim is cut out of his imminent advantage. Thus, broadly stated, motive is generally immaterial. See In re People's Warehouse Co. (D. C.) 273 F. 611; State of Alabama v. Montevallo Mining Co. (D. C.) 278 F. 989. See, also, In re Swift (D. C.) 259 F. 612, and In re Seal (D. C.) 261 F. 112, where the motive and result of procuring a voluntary adjudication went beyond the point of preserving the financial status for the voluntary petitioner, yet the adjudication was upheld. The financial status of the petitioner was actually improved; for the adjudication barred existing creditors, as to whom the bankrupt would get a discharge, from participating in a prospective benefit to the bankrupt under a will. In the case of In re Swift, the mental and physical condition of the testatrix rendered the will irrevocable at the time of the adjudication. Hence the bankrupt had a vested remainder in fact. If the interest had been a vested remainder in law, it would have fallen into the bankruptcy estate. By the closely timed adjudication the bankrupt blocked *existing creditors* from participating in prospective assets; while in the case before us the bankrupt blocked merely a *pro-*

*spective creditor* from participating in existing assets, since under the Bankruptcy Act Mrs. Lowendahl's claim, admittedly founded on a tort, was not a provable one, because not reduced to judgment. In the present case the asset status was preserved; whereas in the Swift Case the asset status was modified for the benefit of the bankrupt. If the latter does not violate the spirit of the Bankruptcy Act, the former, a fortiori, does not do so.

In view of the language in Phillips v. Krakower, 46 F.(2d) 764, decided by the Circuit Court of Appeals for this Circuit in 1931, there is some doubt as to whether the same result would be reached here, on facts similar to those in Re Swift and in Re Seal, above. In the Phillips Case a discharge of the bankrupt would have blocked an existing joint creditor of the bankrupt and his wife from executing against property owned by the bankrupt and his wife as tenants by the entireties during the life of the discharged bankrupt. The bankruptcy proceeding would thus result in a windfall to the bankrupt. An *existing creditor* would be blocked from an existing asset. The Circuit Court of Appeals affirmed an order suspending discharge of the bankrupt, pending the procuring by the existing creditor of a joint judgment against the husband and wife, and an execution on that judgment against the property held as tenants by the entireties. Thus a bankrupt was prevented from improving his situation by bankruptcy proceedings at the expense of an *existing creditor*; but nothing was said against the bankrupt preserving the status quo at the expense of a prospective creditor. Cf. In re Moench & Sons Co. and Home Powder Co. v. Geis, supra.

Reliance is placed by claimants upon the case of Zeitinger v. Dry Goods Co. (C. C. A.) 244 F. 719; In re Hargadine-McKittrick Dry Goods Co. (D. C.) 239 F. 155. There it was held that a court of bankruptcy has power to permit the intervention of stockholders to contest a voluntary petition for adjudication in bankruptcy filed on behalf of a corporation by its officers and directors, by showing that the object of the proceeding was to avoid the effect of a judgment obtained in a state court by stockholders against the corporation and its directors for the appointment of a receiver for the corporation, and for an accounting by the directors for fraudulent mismanagement resulting in waste of the corporation's assets; and, further, that a court of bankruptcy has power, upon such a showing, to dismiss the voluntary petition for adjudication. In reversing the lower court, the Circuit Court of Appeals for the Eighth Circuit said, pages 721, 722 of 244 F.:

"The circuit court adjudged that the board of directors had wasted, misappropriated, and lost the assets of the corporation in many ways, in sums aggregating millions of dollars, for which misappropriation and losses said directors were held accountable and liable, including Martin P. Donahoe, who signed the voluntary petition in bankruptcy as president of appellee; that George H. Allan, who appears in Schedule A as a creditor of appellee, was a defendant in the suit in the circuit court, and was there held accountable in a sum many' times in excess of the amount of his claim. It was also adjudicated by the decree of the circuit court that the guaranty of appellee to the Missouri Pacific Company was ultra vires and void, and a fraud upon appellee and its stockholders, and that at the time the petition was filed in that court the directors of appellee had in their possession assets of the actual and potential value of $3,198,000. The circuit court by its decree referred the matter which required an accounting to a referee for report.

"The intervening petitioners claimed that to allow appellee to file a voluntary petition and be adjudicated a bankrupt, in the face of this record, would result in the commission of a fraud upon the petitioners in intervention and plaintiffs in the suit in the circuit court, as well as upon the circuit court and the United States District Court, in which the voluntary petition in bankruptcy was presented; that it was clearly manifest that the only purpose of filing the voluntary petition was to bring about the appointment of a trustee in bankruptcy, who would necessarily be controlled and appointed by the creditors of appellee, if any, in the interest of the directors and other persons who were held liable in the action in the circuit court, and thereby the whole proceedings and judgment in the circuit court would be paralyzed and rendered abortive. * * * The District Court seemed to be of the opinion that it was helpless to prevent what was apparently a fraud on its own jurisdiction, that of the circuit court, and upon interveners, because it was of the opinion that no defense could be made to the voluntary petition in bankruptcy. But the case made by the intervening petition and the exhibits attached thereto was of a broader signification than a mere litigation of the truth of the allegations in the voluntary petition. * * *

"The District Court, however, could have safely relied upon the proposition that there is and can be no law or practice which would compel a court of bankruptcy or any other court to become a party to a fraud."

The Zeitinger Case has distinguishing features. In it there was involved an unlawful scheme in violation of the act, namely, the control by the wrongdoing officers of the corporation of the trustee in bankruptcy for the purpose of defeating a judgment against the officers; whereas in the present case the Bankruptcy Act was merely resorted to for the purpose of preventing the lessening of the share of existing creditors in the bankrupt's estate.

We adopt as fundamentally sound the following statement by the court in Bank of Elberton v. Swift (C. C. A.) 268 F. 305, at page 308: "Congress enacted the bankruptcy statute in the exercise of a public policy, for the benefit, not of debtors and creditors, but of society at large. It realized, of course, that unscrupulous and dishonest men would take advantage wherever they could of its provisions. Equally of course it was not intended to enable a debtor to rush into bankruptcy just in time to prevent his creditors from satisfying their claims out of property he was about to come into possession of. But the difficulty in any law upon so complicated a subject as business relations is to make it cover every particular case that may possibly arise. It does not seem to us that the act takes into account the motives of creditors in involuntary proceedings, or of debtors in voluntary proceedings; but instead of that, in view of the fact that such a practical subject as business relations between debtor and creditor is being dealt with, it concerns itself rather with conditions as they exist, and undertakes to fix definitely the obligations of the debtor and the rights and remedies of the creditor. In our judgment, it was thought best by Congress to prescribe general rules, which would usually promote satisfactory results, notwithstanding the fact that in isolated instances it would be difficult, if not impossible, to attain to the high standards of exact justice."

Turning to the second of the remaining questions, namely, even assuming fraud, can Mrs. Lowendahl assert it in the present proceeding, what we have already said in answer to the preceding question is conclusive that there was no fraud, and even though there were, it is at least doubtful whether it could be asserted in the present case. It is true Mrs. Lowendahl filed, on April 9, 1931, more than three years ago, a petition to have the bankruptcy proceeding dismissed on the ground of fraud. On the same day, Mrs. Lowendahl also filed the proof of claim. An answer was filed to this petition, but a hearing was never pressed, and the petition was later abandoned.

Lastly, in answer to the question whether there was such collusion between the bankrupt corporation and certain of its creditors, in the procuring of the order to show cause which stayed the formal entry of judgment by the New York court, as to constitute fraud upon the bankruptcy court, we do not find such to have been the case. We find that the efforts to obtain the stay in New York were not illegal. Royal Baking Powder Company and other creditors involved therein were in the same position as Mrs. Lowendahl. The claims of the whole group arose out of the alleged fraudulent conveyance from Walter Van Bokkelen to the bankrupt corporation. It is true that, as it turned out, the Royal Baking Powder Company and the other creditors co-operating with them defeated their own ends, as well as those of Mrs. Lowendahl. But it cannot be said that they were not within their rights in seeking to promote their own interests as they did.

In view of the fact that all the four claims involved in this case originally arose out of the alleged fraudulent conveyance to the corporation, and the alleged consequent unjust enrichment of the corporation; and in view of the further fact that we have concluded above in respect to the claims of Royal Baking Powder Company, Kennerly-Hall and Stirling, and the National Cold Storage Company that the conveyance to the corporation was not fraudulent, and that there was no unjust enrichment, we necessarily reach the conclusion in respect to the Lowendahl claim that, in addition to its being unprovable as an alleged judgment, it should also have been disallowed as a claim founded on an implied contract because of alleged unjust enrichment, in the event that Mrs. Lowendahl had had an opportunity to file her claim on such ground.

It follows from what we have said that all of the four claims here involved must be disallowed, and with respect to one of them, the Lowendahl claim, the conclusions of the referee are accordingly reversed.