GRACE E. LOWENDAHL, Respondent, *v.* THE BALTIMORE AND OHIO RAILROAD COMPANY and Another, Appellants.

First Department, April 3, 1936.

*William D. Whitney* of counsel [*Bruce Bromley* and *Albert R. Connelly* with him on the brief; *Cravath, deGersdorff, Swaine & Wood,* attorneys], for the appellants.

*Neil P. Cullom* of counsel [*James E. Freehill* and *Henry W. Steingarten* with him on the brief], for the respondent.

DORE, J. Defendant New York Transit and Terminal Co., Ltd. (hereinafter referred to as the " terminal company "), is the wholly-owned subsidiary of defendant Baltimore and Ohio Railroad Company (hereinafter referred to as the " railroad "). Plaintiff is the assignee of an English corporation, Connolly, Shaw & Co., Ltd., which, in January, 1929, loaned £50,000 sterling to Libertus Van Bokkelen (hereinafter referred to as " Libertus ") upon the promissory note of Libertus and of his brother, Walter Van Bokkelen (hereinafter referred to as " Walter "). On May 14, 1930, this plaintiff recovered judgment against Walter and the estate of Libertus on the note, with interest, in the sum of $211,782.56. On March 16, 1931, plaintiff recovered judgment of $222,594.12 against L. Van Bokkelen, Inc., on the ground that the transfer of the business made by Walter, November 1, 1929, to L. Van Bokkelen, Inc., was made when Walter and the estate of Libertus were wholly insolvent, and with intent to defraud creditors. (*Lowendahl* v. *Van Bokkelen, Inc.,* 139 Misc. 857; affd., 234 App. Div. 749; 260 N. Y. 557.) Thereafter plaintiff sued these defendants on the basis of the prior judgment of March 16, 1931. That complaint was dismissed at Special Term on the ground that the prior judgment against Van Bokkelen, Inc., was not binding on these defendants, and that they were entitled to litigate the issues on the merits in an entirely separate record. The judgment of dismissal was affirmed by this court. (*Lowendahl* v. *Baltimore & Ohio R. R. Co.,* 239 App. Div. 899.) Thereafter the present action was begun.

The amended complaint in this action sets forth the indebtedness of the Van Bokkelens evidenced by the judgment; alleges that the transfer to the corporation L. Van Bokkelen, Inc., on November 1, 1929, was not made in the regular course of business, was made at a time when Walter and the estate of Libertus were wholly insolvent, for an inadequate consideration, and with intent to defraud creditors,

including this plaintiff; alleges that the judgment of March 16, 1931, for $222,594.12 adjudicated the transfer fraudulent and void; and further alleges that the corporation L. Van Bokkelen, Inc., in the perpetration of the said fraud, was acting under the authority and in the right of these defendants which, by virtue of stock ownership and control of officers and directors, exercised such dominion over the Van Bokkelen corporation as to make it their mere instrumentality, agent and dummy. The complaint prays that defendants be held accountable to plaintiff for the value of the property transferred to Van Bokkelen, Inc., and that plaintiff have judgment against defendants for $211,782.56 (the amount of the judgment on the note), with interest from May 14, 1930.

The answer, as amended, admits the judgment against Walter and the estate of Libertus, and the judgment against L. Van Bokkelen, Inc., but denies the fraudulent character of the transfer, the alleged dominion and control, and pleads as a bar to the maintenance of the action a judgment of the United States court in Maryland in the bankruptcy proceedings of L. Van Bokkelen, Inc., adjudicating that the transfer in question was not fraudulent and disallowing this plaintiff's claim.

After trial of the issues at Special Term the trial court sustained plaintiff's contentions, and held defendants liable to plaintiff for the amount of the judgment of March 16, 1931, against L. Van Bokkelen, Inc., on the theory that these defendants, from the very inception of L. Van Bokkelen, Inc., so controlled and dominated its business and affairs, including the claimed fraudulent transfer of November 1, 1929, on which the prior judgment was predicated, that the Van Bokkelen corporation had no will or existence of its own, but was the mere dummy, instrumentality or department of defendants' own business; that is, the court disregarded and set aside the corporate entity of the Van Bokkelen corporation and held the defendants as the real actors. This appeal brings before this court the correctness of that determination.

On the argument of the appeal, defendants, by order to show cause, moved to dismiss the action for lack of jurisdiction on the ground that the complaint shows on its face that the transferor (Walter) had been duly adjudicated a bankrupt prior to the commencement of the action and that this court has no jurisdiction over the subject-matter or the cause of action. Before discussing the merits we will dispose of the preliminary issues relating to jurisdiction and the defense of *res adjudicata*.

The objection to jurisdiction was not raised until the case was on the calendar of this court. Therefore, if it be viewed as a contention that plaintiff is without capacity to sue, it must be deemed to have

been waived as not timely made under the provisions of section 278 of the Civil Practice Act. Defendants insist, however, that there is a complete lack of jurisdiction and not a mere incapacity to sue in that title to property conveyed by a bankrupt in fraud of creditors is vested in the trustee in bankruptcy under clause (4) of subdivision (a) of section 70 of the Bankruptcy Act (U. S. Code, tit. 11, § 110, subd. [a], cl. [4]), and the right to recover is vested solely in the trustee by virtue of subdivision (e) of section 70. (U. S. Code, tit. 11, § 110, subd. [e].)

On this preliminary motion, the proof is conclusive that Sidney F. Stongin, Walter's trustee in bankruptcy in the United States District Court for the Southern District of New York, had been fully apprised of this litigation and affirmatively had taken the position not to intervene in this or any related action. In that state of facts, the law is clear that the trustee has effectively abandoned the claim. Under like circumstances the United States Supreme Court in *Connell* v. *Walker* (291 U. S. 1, 5 [1934]) in overruling a similar contention said: " The right asserted [of the creditor to bring the action to set aside the fraudulent conveyance] is one given the creditor by State law which the Bankruptcy Act withdraws from him only upon the election of the trustee to assert the rights of the creditor, as he is privileged to do by § 70 (e), 11 U. S. C. A. § 110 (e), an election, which, in this case, does not appear to have been made." That case followed and applied the rule laid down in *Dushane* v. *Beall* (161 U. S. 513). It would be a denial of justice to hold that a creditor is barred from prosecuting a suit to recover his debt merely because the trustee does not seek to enforce the claim on the creditor's behalf. The motion to dismiss for lack of jurisdiction is accordingly denied as without merit.

Defendants further contend that the decree of the United States District Court of Maryland (in the *Van Bokkelen, Inc.*, bankruptcy proceedings) disallowing plaintiff's claim is *res adjudicata* in defendants' favor on the issues here presented. But the plaintiff in that bankruptcy proceeding submitted her claim only on the theory that she was a judgment debtor, *i. e.*, claiming recovery on an instrument in writing (viz., the judgment) absolutely owing at the time of the filing of the petition in bankruptcy. That claim was disallowed by the United States District and Circuit Courts in Maryland on the ground that the New York judgment was, as a matter of fact, entered subsequent to the date of the petition in bankruptcy, and that the *nunc pro tunc* order predating the judgment, and made by the New York court when it learned of the filing of the bankruptcy petition, did not cure the defect.

(See *Matter of Van Bokkelen, Inc.,* U. S. Dist. Ct. Md. June 28, 1934, 7 F. Supp. 639; affd., *sub nom. Royal Baking Powder Co. v. Hessey,* Cir. Ct. of Appeals, 4th Cir. April 2, 1935, 76 F. [2d] 645.) The merits of plaintiff's claim were not litigated in that proceeding, and this court is not precluded by the determination of the Federal court therein. The defense of *res adjudicata* is accordingly dismissed.

That the transfer from Walter to Van Bokkelen, Inc., has been adjudged fraudulent by our courts in *Lowendahl* v. *Van Bokkelen, Inc. (supra),* does not predicate liability against these defendants. That judgment, as above indicated, is conclusive only as between the parties to that action and is not binding on these defendants. (*Lowendahl* v. *Baltimore & Ohio R. R. Co.,* 239 App. Div. 899.) We thus come to a consideration of the merits of this litigation. This requires recital and analysis of a somewhat complicated state of facts before exposition of the legal principles applicable.

For many years prior to his death in 1929, Libertus Van Bokkelen conducted in his own name as an individual an extensive and apparently profitable business, exporting and importing food stuffs, principally between South America and the United States, acting as selling and distributing agent for a number of well-established industries in the United States, and also acting as steamship agent and broker on commission. His business was carried on in two main divisions, Buenos Aires and New York, with the latter office under the management of his brother Walter as an employee. An associated business enterprise, in which Libertus had a fifty-one per cent partnership interest, was carried on at Montevideo, Uruguay, under the name of Van Bokkelen & Rohr. Libertus also had offices for the transaction of the business in various other parts of South America and the United States.

The loan by plaintiff's assignor, Connolly, Shaw & Co., Ltd., made January 31, 1929, was evidenced by a promissory note for £50,000, unsecured, payable December 7, 1929, executed by Walter, as attorney-in-fact of Libertus, and also signed by Walter individually as accommodation comaker. On February 9, 1929, about a week after giving the note, Libertus died intestate in Argentina, and thereafter, for a short time, his individual business there was carried on apparently by his estate under the name " Sucesion L. Van Bokkelen." Walter assumed the active management of the business, and on August 9, 1929, Libertus' widow (who had obtained the ownership of the business through assignment of the interests of other heirs) transferred to Walter by bill of sale the entire business, its assets and good will, for the stated consideration of 50,000 pesos, Argentine paper currency. When he took

over the business, Walter also assumed its liabilities, which were heavy. Walter testified that he owed in notes alone (including the note of plaintiff's assignor) $490,000.

The record discloses that in 1928 and early in January, 1929, Libertus and Walter had planned an expansion and incorporation of the business. Following the death of Libertus, Walter was actively engaged in the development of plans to incorporate and raise new capital. He engaged in these efforts during the very height of what is now called the "prosperity boom." Prior to meeting representatives of defendants in October, 1929, Walter had sought new capital from various sources during the spring and summer of 1929. Thus, efforts were made by him to interest other exporters and a banking firm in investing capital. By May, 1929, he had drafted plans which provided for the incorporation of the Argentine branch of the business, a separate corporation for the Montevideo branch then being conducted by the partnership of Van Bokkelen & Rohr, a third corporation for the United States branch, and a fourth holding company controlling the other three. On May 29, 1929, he wrote to one Titus, of the Bank of the Manhattan Company, the chief bank of the Van Bokkelen business, a long report on the general condition of the business as then conducted, showing its important exclusive agency accounts, total gross profit estimated for 1929 of $397,500 in the Argentine alone, $80,000 net profits in Uruguay (Uruguay gold), and containing elaborate plans for incorporation. On June 21, 1929, Walter told Titus the business was increasing in volume and profit; that he was very enthusiastic about its prospects; that he had been devoting a great deal of time to plans for incorporation and thought he had interested large companies such as the Corn Products Refining Company; that part of his plan was to be president and run the company for those who put up the money, who would get fifty-one per cent of the stock, Walter taking a minority interest of forty-nine per cent.

On August 14, 1929, Walter wrote to one James H. Graves, who was engaged in the steamship business, with reference to conferences covering a steamship and commercial venture, and stated he was in favor of the plans, prepared to co-operate, and upon completion of plans for financing, Walter could assure Graves of participation to the extent of $300,000. On September 17, 1929, Walter had a conference with one Stuart Black, of Black & Company, Ltd., Glasgow, engaged in the shipping business, in which Black made the proposal that the Van Bokkelen business act as agents and loading brokers for a proposed line of refrigerator and general cargo steamships between New York and the River

Plate which was to be under Walter's own supervision; Walter answered this radiogram on September 23, 1929, stating he was definitely interested in a fortnightly service between the United States and the River Plate; Black cabled a proposal on September 24, 1929, which included, if necessary, the building of additional tonnage; Walter replied on September thirtieth that he would like to start operations of the fortnightly service in late December or early January, and, if it was necessary to build additional tonnage, he thought it could be arranged.

After all these plans for incorporation and expansion, including a steamship service, had long been considered, developed and formulated by Walter (the main outlines of which remained substantially unchanged; $1,500,000 for new capital, fifty-one per cent control for the investor, forty-nine per cent for Walter, and presidency and management for Walter) and after Walter had unsuccessfully tried to interest responsible investors here and in South America, it was not till October, 1929, that Walter, for the first time, met any officer of the defendants. The first contact was on October 5, 1929, with Fries, vice-president and traffic manager of the railroad. Walter told him the amount of merchandise he was handling, and that he had heard through Mr. Marshall (a lawyer who also represented the Baltimore Chamber of Commerce and was interested in developing the commerce of the city and the port of Baltimore) that the railroad would be interested in his proposal. Fries said he was very much interested and referred Walter to George M. Shriver, Sr.

On October 8, 1929, Walter met Shriver, Sr., vice-president of the railroad. A written proposal, dictated October 5, 1929, addressed to Marshall and signed by Walter, was presented, outlining the proposed transfer of the assets of the Van Bokkelen business to a corporation to be formed with a capital of $1,500,000, referring also to the proposed agency and establishment of a steamship line from Baltimore to South American ports, containing the aforesaid percentages of stock control for the investor and Walter, and providing that Walter was to assume and pay all liabilities of the Van Bokkelens. Walter also gave Shriver a general and a very favorable picture of the Van Bokkelen business, its amount and volume in round numbers, stated that he needed $1,500,000 additional working capital, that the Bank of Manhattan had been financing the business, and told Shriver of the possibility of an agreement with Mr. Black's steamship line under which a fortnightly service could be secured from Baltimore to Buenos Aires. At this interview it was agreed that the proposed corporation could proceed with a cash capital of $500,000, plus a bank credit

of $1,000,000, partly secured and partly unsecured. There is no question that the railroad company was very much interested in the traffic possibilities of the proposed venture. Shriver, however, wanted to consult the Bank of Manhattan, the principal bank of the Van Bokkelens, before making a final decision. This bank happened also to be fiscal agent of the railroad.

Shriver interviewed Titus, of the Bank of Manhattan Company, on October 10, 1929, and was told that the bank was handling the Van Bokkelen New York account and loaning considerable money, and would continue to loan; that the bank knew the business was profitable, and that its credit standing was excellent. Titus also had a series of bank statements showing a strong position and Shriver testified he stated that if the business were to liquidate it would show a net result of something over $300,000. After a private conference with Titus, Shriver practically accepted Walter's proposal.

On October 30, 1929, Walter produced and showed to Shriver a balance sheet of the estate in Buenos Aires prepared and signed by Price, Waterhouse & Co. as of July 15, 1929, showing a net worth of $370,539.03 (Argentine paper), and the statement was made that there was no material change from July fifteenth to October, and that the business had been run right along on a profitable basis. Shriver also testified Walter had assured him that with the closing of Libertus' estate and the adjustment of his own interest Walter would realize not less than $300,000 net cash, and would have that much capital available for his own personal investment in the business or otherwise.

The corporation was capitalized at 5,000 shares class A preferred stock, par value $100 each; and 30,000 shares common, no par value; with the name L. Van Bokkelen, Inc., it had been organized under the laws of Maryland on October 14, 1929, by Marshall, in order, as Marshall stated, to be ready to move when the negotiations were concluded. Walter advanced to Marshall $1,000 of his own funds for expenses, for which Walter was later reimbursed by the Van Bokkelen corporation; the railroad paid Marshall $5,000 for services, Walter claims for bringing the Van Bokkelen business to the railroad, the defendants claim for prior services during two years preceding, developing the traffic possibilities of the city and port of Baltimore. Marshall was also paid $2,500 by Van Bokkelen, Inc., for his services.

The Bank of Manhattan Company subscribed $500,000 for the preferred stock, this subscription being based on an agreement entered into with the defendant terminal company, under which the latter agreed to take up the preferred stock within two years.

This subscription was secured by a special deposit. The common stock was issued as follows: forty-nine per cent to Walter and fifty-one per cent to three officers of the bank, who acted as voting trustees and who, in turn, delivered trust certificates representing thirty-one per cent to the bank's affiliate, International Manhattan Company, and twenty per cent to Marshall and the Baltimore promoters for their services. Walter Van Bokkelen was elected president and was given a five-year contract at $25,000 a year salary.

By the instrument of transfer, dated November 1, 1929, Walter Van Bokkelen sold to L. Van Bokkelen, Inc., the assets, as follows: (1) the merchandise, furniture, fixtures, automobiles, trucks and good will, trade name and trade-marks of the Buenos Aires division of the business of Libertus Van Bokkelen; (2) fifty-one per cent of the capital stock of Van Bokkelen & Rohr, Inc., a corporation of Uruguay, which had been formed to take over the business of the Montevideo partnership of Van Bokkelen & Rohr. The bill of sale also provided that all liabilities of the business should be retained and liquidated by Walter.

Subsequently the cost price of the merchandise in Buenos Aires was determined by Price, Waterhouse & Co., to be $151,998.07, and this amount was paid by L. Van Bokkelen, Inc., to Walter between December 19 and 31, 1929. L. Van Bokkelen, Inc., also paid him in March, 1930, an additional $124,000 for the then ascertained value of the fifty-one per cent interest in Van Bokkelen & Rohr, Inc.

On November 1, 1929, the corporation commenced the business for which it was formed. Soon after its organization George M. Shriver, Jr., son of the senior vice-president of the railroad, became its treasurer.

Prior to November 13, 1929, a large part of the capital which was put into the new corporation was transferred to South America to take up the merchandise in Buenos Aires; and $75,000 additional was expended for stock interest in the Blavan Line, Inc., the steamship company organized by Black for service between Baltimore and South America.

After the beginning of 1930 the new corporation already showed need of additional funds. The financial condition existing in the world markets due to the unprecedented commercial and financial collapses beginning about November, 1929, naturally caused the Bank of Manhattan to change its attitude with reference to the amount of credit to be extended. Under these circumstances it was necessary to look to stockholders for funds necessary to carry on. Walter, holder of forty-nine per cent of the voting stock, was

in no position to be of any financial assistance, and the defendant terminal company accordingly guaranteed loans of the corporation during the year 1930 totaling over $300,000.

The trial court found that on November 1, 1929, both Walter and the estate of Libertus were insolvent. It is a fair inference that Walter, at least, was insolvent long before that date, and that he had hoped to pull himself and the business out of increasing difficulties by the new financing, affording him ready cash capital, placing the business on a surer foundation, and enabling him, as he hoped, to pay his debts. His hopes were destined to certain frustration by the economic trend of events: the enterprise was launched in the fateful November of 1929.

The trial court also reached the conclusion that the transfer was not only fraudulent, but that these defendants, from the very inception of Van Bokkelen, Inc., so controlled and directed its affairs that the corporation had no existence of its own, but was a mere department of the defendants. On the correctness of these findings defendants' liability depends.

Stockholders' immunity from corporate obligation is fundamental to the very concept of the corporation as a separate legal entity. Around it the entire body of corporation law is built. It is accepted in theory and practice and ingrained in our legal and economic systems. Courts will not lightly disregard the corporate entity. The burden is on the complainant to establish by a preponderance of evidence all the elements necessary.

Control through mere ownership of a majority or of even all the capital stock and the use of the power incident thereto to elect officers and directors will not, in and of itself, predicate liability. (*Senior* v. *N. Y. City R. Co.*, 111 App. Div. 39; affd., 187 N. Y. 559; *Stone* v. *Cleveland, C., C. & St. L. R. Co.*, 202 id. 352; *Kingston Dry Dock Co.* v. *Lake Champlain Transportation Co.*, 31 F. [2d] 265 [1929].) Liability must depend upon a domination and control so complete that the corporation may be said to have no will, mind or existence of its own and to be operated as a mere department of the business of the stockholder. (*Berkey* v. *Third Avenue R. Co.*, 244 N. Y. 84 [1926]; *United States* v. *Reading Co.*, 253 U. S. 26 [1920]; *Rapid Transit Subway Construction Co.* v. *City of New York*, 259 N. Y. 472 [1932].)

In *Berkey* v. *Third Avenue R. Co.* (*supra*) our Court of Appeals (per Cardozo, J.) said: " The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. We say at times that the cor-

porate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized as an ' alias ' or a ' dummy.'   All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term to be defined is the act of operation.   Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent.   Where control is less than this, we are remitted to the tests of honesty and justice."

In *Kingston Dry Dock Co.* v. *Lake Champlain Transportation Co.* (*supra*) the United States Circuit Court of Appeals, Second Circuit (per L. HAND, J.) rules as follows: " Control through the ownership of shares does not fuse the corporations, even when the directors are common to each.   One corporation may, however, become an actor in a given transaction, or in part of a business, or in a whole business, and, when it has, will be legally responsible.   To become so it must take immediate direction of the transaction through its officers, by whom alone it can act at all [citing numerous cases].   At times this is put as though the subsidiary then became an agent of the parent.   That may no doubt be true, but only in quite other situations; that is, when both intend that relation to arise, for agency is consensual.   This seldom is true, and liability normally must depend upon the parent's direct intervention in the transaction, ignoring the subsidiary's paraphernalia of incorporation, directors and officers.   The test is therefore rather in the form than in the substance of the control; in whether it is exercised immediately, or by means of a board of directors and officers, left to their own initiative and responsibility in respect of each transaction as it arises.   Some such line must obviously be drawn, if shareholding alone does not fuse the corporations in every case."

In *United States* v. *Reading Co.* (253 U. S. 26 [1920]) the Supreme Court of the United States held: " Where such ownership of stock is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, or instrumentality or department of another company, the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them, as the justice of the case may require."

In formulating a basis for predicating liability the courts have variously used the " agency," " identity " or " instrumentality " theories.   With regard to " agency," the United States Circuit Court of Appeals, in *New York Trust Co.* v. *Carpenter* (250 Fed.

668, 673), said: " The District Court used the word ' agency ' as a synonym of ' adjunct,' whatever that may mean, and as descriptive of a relation variously defined in the cases as ' adjunct,' ' branch,' ' instrumentality,' ' dummy,' ' buffer,' and ' tool,' but all in the sense of ' means ' through which a corporation's own business is actively prosecuted; or of the relation created when two corporations are in substance identical though operating under different names. But in every case in which a corporation has been held liable for the debt of another because of dominance or control through stock ownership or otherwise and not depending on principles of agency or estoppel, the reason was that to hold otherwise would result in a wrong for which the law must find a remedy. For the purposes of this discussion, ' agency,' ' adjunct,' ' branch,' ' instrumentality,' ' dummy,' ' buffer,' and ' tool,' all mean very much the same thing."

Except in cases of express agency the use of the term " agent " seems unfortunate and may tend to confuse. When legal liability is predicated on principles of agency, the existence and entity of the agent are not ignored or set aside but affirmed, and the principal held precisely because the agent *did* act in the course of his employment and within the scope of his authority. The very opposite is true when the subsidiary's corporate entity is set aside and ignored and the parent held liable. Indeed, any severely logical application of agency rules would destroy the protection afforded stockholders by incorporation. (See Powell " Parent and Subsidiary Corporations," chap. V, p. 89 *et seq.*) As the court said in *New York Trust Co.* v. *Carpenter* (*supra*), if " all systems of control exercised by corporations over their subsidiary companies through ownership of stock or because of identity or substantial identity of stockholders or directors are illegal " then " the rule of the separate entity and responsibility of corporations for their own acts and contracts is swallowed up in the exception. This cannot be."

In the " identity " theory the separate corporate entity of the subsidiary is disregarded and the parent and subsidiary are regarded as one. That theory is exemplified in *United States* v. *Lehigh Valley R. R. Co.* (220 U. S. 257, 272) and also in *Minifie* v. *Rowley* (187 Cal. 481; 202 P. 673).

Except, therefore, in cases of express agency, estoppel or direct tort committed by a parent corporation, the " instrumentality " rule seems to furnish the most practical and effectively applicable theory for breaking down corporate immunity where equity requires that this be done to circumvent fraud or other legal wrong. The " instrumentality " rule may be formulated as follows: Where a

parent corporation, at the time of the transaction complained of, (1) exercises control over its subsidiary not in a manner normal and usual with stockholders, but to such extent and in such manner, in disregard of the subsidiary's corporate paraphernalia, directors and officers, that the subsidiary has become a mere instrumentality or department of the parent's own business and the parent, under the unreal form of the subsidiary, is the real actor in the transaction; or where the business and officers of the two corporations have become so inextricably confused that it is impossible or impracticable to identify the corporation that participated in the transaction attacked; and (2) where such control has been used by the parent to commit fraud, or violate other legal duty, or has been used to do an act tainted by dishonesty or unjust conduct violating plaintiff's rights or under circumstances giving rise to an estoppel; and (except in estoppel cases) (3) where such fraud or wrong results in unjust loss and injury to plaintiff,— the court, in disregard of the corporate entity of the subsidiary, will hold the parent liable. Even without the preceding restrictions and limitations, the parent corporation will be liable where the parent has expressly made a subsidiary its agent or has itself committed the tort in suit, as, for example, in the railroad system cases relating to personal injuries where the employees committing the tort were held to be the immediate employees of the parent as well as of the subsidiary. (*Pennsylvania R. Co.* v. *Anoka National Bank*, 108 Fed. 482 [C. C. A. 8th Cir.]; *Davis* v. *Alexander*, 269 U. S. 114; *Lehigh Valley R. R. Co.* v. *Dupont*, 128 Fed. 840 [C. C. A. 2d Cir.]; *Lehigh Valley R. R. Co* v. *Delachesa*, 145 id. 617. See, also, *Stone* v. *Cleveland, C., C. & St. L. R. Co.*, 202 N. Y. 352.)

Restating the instrumentality rule, we may say that in any case except express agency, estoppel or direct tort, three elements must be proved:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had *at the time* no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. (See Powell " Parent and Subsidiary Corporations," chaps. I to VI, *passim*, and numerous cases cited.)

Applying these rules to the case at bar, as tried and briefed on appeal, we hold that plaintiff must establish that the conveyance made November 1, 1929, by Walter was not the independent and separate act of Walter Van Bokkelen, as transferor, and L. Van Bokkelen, Inc., as transferee, but that the real actors in the transaction at that time were the defendant corporations exercising such obtrusive and complete domination and control that L. Van Bokkelen, Inc., the instrumentality through which they acted, was under compulsion by them to consummate the transfer, *i. e.*, that the transfer was in fact and in truth *their* act and they the real transferees; that such action was, on *their* part, an actual or constructive fraud or other legal wrong to plaintiff's rights; and that such act of *theirs* proximately caused plaintiff's loss on the note. Such improper fraudulent activity will not be presumed, nor can it be based merely on suspicion, conjecture or doubtful inference. Fraud here, as elsewhere, must be established by clear and convincing factual proof.

It must also be kept in mind that the unlawful control must be shown to have been exercised *at the time the acts complained of took place*. That, in this case, means on or about November 1, 1929. The importance of this time element was not, we believe, properly considered by the learned court at Special Term. The voluminous evidence introduced showing numerous facts that took place long after November 1, 1929, might, indeed, be considered in so far as it helped to reveal the true nature of the transaction and the real actor in the conveyance of November 1, 1929, but it should not have been considered as determinative of the result in so far as it tended only to show claimed control long after the transaction complained of and having no relation to its consummation.

A careful perusal of the entire record, as well as the briefs, leads to the conclusion that domination and control by defendants, as illustrated in the authorities and defined above, is not proved to have been exercised at the time of the transaction here attacked. This, we think, is indicated by the above recital of the facts. Only a brief further analysis must suffice.

The plan of organizing the new corporation, the essential outline of its capitalization and corporate structure, the percentages of stock control, and the transfer of the business, were the ideas of Walter Van Bokkelen. That plan had been conceived and developed by him long before any contact with the defendants or their officers. He was the real entrepreneur of the transfer and the enterprise that followed the transfer. It is clear that at the time of the transfer and, at least, for months thereafter

the business was conducted by Walter, as president, and James H. Graves, as vice-president, and this business direction continued until Walter's personal bankruptcy in May, 1930, rendered it unwise to continue him as head of the organization. The corporate defendants, up to, at and immediately after the conveyance took place acted in the manner usual and normal for majority stockholders having a large investment in the enterprise. Activities of the corporation after it started business on November 1, 1929, show that the corporation under the executive management of Walter, was conducting its own business and was not a mere department of the railroad, nor was there such fusion of the separate corporate entities as to make Van Bokkelen, Inc., a mere dummy or instrumentality of defendants. That the defendants at the time in question exercised control over the real business of Van Bokkelen, Inc., its merchandising activities, purchase, sale, importing and exporting, its shipping agency activities, including brokerage and stevedoring, is not established. There is no proof of such control at the time of the transaction in question. Walter was a director, owner of forty-nine per cent of voting stock, and president under a five-year contract which gave him " the full management and control of the business with the powers of President as set forth in the by-laws of the Corporation, subject only to such control by the Directors of the Corporation over the general business and policy of the Corporation as is generally exercised by Directors in similar companies." The vice-president and a director was James H. Graves, who had known Libertus since 1919 and Walter since 1927, and it was Walter who had conducted the negotiations for employment of Graves whom Shriver had never met prior to the time Graves became an officer of Van Bokkelen, Inc. The general manager of the entire Argentine business was Thomas F. Hudson, who had been, for many years prior thereto, in the employ of Libertus and, later, of Walter. Titus, at the outset treasurer and one of the directors, was vice-president of the Bank of Manhattan Company, had known Libertus since 1915, Walter since 1927, and had acted as New York banker for both Libertus and Walter since 1927. Titus and Rogers were both suggested as directors by Goodhue, president of the Bank of Manhattan Company, by reason of their familiarity with South American business.

Plaintiff makes much of the fact that the new company took over the assets but did not assume the liabilities of the Van Bokkelens and that Shriver did not expressly ask Walter about his debts. Concededly, Shriver did ask about the Van Bokkelens' financial standing and credit, and received most favorable reports

both from Walter and the bank and the statements submitted to him.

After the organization of the corporation and long after the conveyance and transfer that is the basis of this claim, when the business depression, which was becoming deeper and more widespread, made itself more and more acutely felt in the new enterprise, the corporation was compelled to look to its stockholders for additional capital. Walter, as indicated, was in no position to be of any financial assistance, and the defendant terminal company guaranteed over $300,000 of corporate loans during the year 1930. Following the withdrawal of Walter from the corporation in May, 1930, after he had gone into bankruptcy, the executive management was taken over by Graves.

By the time of Walter's withdrawal, the railroad had become a major creditor, and the prospect was that if any return was to be had on the original investment, further advances would have to be made. These advances as indicated above were continued during 1930. Then the situation became somewhat similar to that reviewed in *Owl Fumigating Corporation* v. *California Cyanide Co.* (30 F. [2d] 812), where the court pointed out that any suggestions which the parent corporation made as to the conduct of the subsidiary were referable to the interests of a large creditor of the company. There the parent corporation had complete stock ownership; nevertheless, it was held that the parent was not liable for the acts of its subsidiary. The conduct of these defendants during 1930 after Walter retired is analogous to that considered in *Chicago Mill & Lumber Co.* v. *Boatmen's Bank* (234 Fed. 41, 46) where the court said of similar acts of a large stockholder and creditor, " they are all easily and naturally referable to a legitimate and customary practice of keeping an oversight by a creditor over the business, management, and operations of a debtor of doubtful solvency." In March, 1931, less than a year and a half after its incorporation, the corporation of L. Van Bokkelen, Inc., was placed in voluntary bankruptcy.

Plaintiff's counsel marshals every fact that can possibly tend to show obtrusive and improper control. But the overwhelming majority of the facts relied on happened, not at the time of the act complained of, but months later and are, on the whole, so remote in time and pertinency as to afford no evidence of control at the prior and *solely relevant* time. Even if the evidence established control and domination, from and after May, 1930, when Walter resigned, that fact does not predicate liability against the defendants for an alleged fraud claimed to have been perpetrated through defendants' control on November 1, 1929, where it affirma-

tively appears that in the interval between the alleged fraudulent transfer and the condition beginning in the spring of 1930, at least four or five months later, material changes had taken place.

Plaintiff seeks to impute to defendants the assumed guilty knowledge of Walter and his attorney, but the record does not justify the imputation. Plaintiff's claim arises on a loan, wholly unsecured, made by plaintiff's assignor in January, 1929, to Libertus Van Bokkelen, an individual whom defendants never knew. In view of all the facts and circumstances disclosed, it is a fair inference that before November 1, 1929, this unsecured business risk had already materialized. The note was not due until December, 1929, but it could not be paid nor could the other outstanding obligations be met unless extensive new capital investment was found for the Van Bokkelens. These defendants, as complete outsiders, without any knowledge of plaintiff's note or the claims of other creditors, and after inquiry and assurance that the firm's credit standing was excellent, were brought into the transaction as contributors of cash capital in the sum of $500,000. A substantial part of this was concededly made available to Walter through the purchase of the assets, thus providing funds for creditors.

Both insolvency and inadequacy of consideration are prerequisites to a finding of constructive fraud. Plaintiff inconsistently insists that Walter and the estate were " hopelessly insolvent " and yet, at the same time, maintains that the good will of the business was of an actual worth of $3,000,000. But in view of Walter's knowledge of the available market for the sale of such an enterprise and in view of his industrious efforts, from January to October, 1929, to make a sale on better terms, it is a fair inference that the transfer made was the best obtainable in the then available market, and it was to the Van Bokkelen corporation, not to these defendants, that the assets were transferred and immediately used in *its* business and not the defendants'. If this plaintiff was defrauded by the transaction of November 1, 1929, it was not the fraud, either actual or constructive, of the defendants. They had no actual intent to defraud plaintiff's assignor, of whose existence at the time of the transfer they were in total ignorance, and as responsible business organizations they had no motive to assist an entire stranger in defeating a claim on a note they had never heard of. It is wholly unreasonable to suppose that by any such act they would, at its very inception, jeopardize so large an investment.

On the facts in this record the ruling of the Court of Appeals in *Berkey* v. *Third Avenue R. Co.* (*supra*), in and of itself, would be sufficient as a binding authority to defeat plaintiff's claim. That case is so well known that it is unnecessary to summarize the facts in great detail. Plaintiff there sued to recover damages for personal injuries received through the negligence of a motorman, an employee of a subsidiary of the defendant; the defendant owned substantially all the common stock of the subsidiary; the executive officers, president, treasurer, general manager, paymaster and counsel of the two companies were the same and the directors nearly so; the defendant made numerous loans to the subsidiary, including loans for construction and sometimes for operating expenses, and owned all the second mortgage bonds of the subsidiary; the cars of both companies bore the legend, " Third Avenue System;" the parent leased the cars to the subsidiary for a daily rental; one legal department, one accounting department, and one claim department functioned for the entire system. Yet the Court of Appeals held that even these facts were not sufficient to show such identity that the parent corporation would be liable. The court said: " Liability of the parent has never been adjudged when the subsidiary has maintained so consistently and in so many ways as here the separate organization that is the mark of a separate existence, and when the implication of a contract for unity of operation would be the implication of a contract for the commission of a crime." The evidence of control and domination there was stronger than in the present case. Yet in this, the leading case in which our Court of Appeals has considered the liability of a stockholder corporation, the court held that the plaintiff had failed to make out a cause of action for disregard of the separate corporate entity.

We conclude that the plaintiff has failed to establish that the transfer to Van Bokkelen, Inc., was, in fact, a transfer to these defendants, and the judgment appealed from should be reversed, with costs, and the complaint dismissed upon the merits, with costs.

McAvoy, Townley and Cohn, JJ., concur.

Judgment unanimously reversed, with costs, and the complaint dismissed upon the merits, with costs.

The findings inconsistent with this determination should be reversed and such new findings made of facts proved upon the trial as are necessary to sustain the judgment hereby awarded. Settle order on notice.