## ATLANTIC MANAGEMENT CORPORATION v. AMERICAN CASUALTY CO. OF READING.

### No. 8406.

Circuit Court of Appeals, Third Circuit.
Argued Jan. 20, 1944.

Decided Feb. 3, 1944.

Rehearing Denied March 10, 1944.

Sabato M. Bendiner, of Philadelphia, Pa. (Irvin Bendiner, of Philadelphia, Pa., on the brief), for appellant.

Edward I. Weisberg, of Philadelphia, Pa. (David N. Feldman, of Philadelphia, Pa., and Harry Green, of Newark, N.J., on the brief), for appellee.

Before JONES and McLAUGHLIN, Circuit Judges, and KALODNER, District Judge.

McLAUGHLIN, Circuit Judge.

This is an equity matter in which the plaintiff obtained a money judgment in the District Court against the defendant. The action was founded on a prior judgment in favor of the plaintiff against Keystone Operating Corporation. The basis of the decision here was as stated in the Trial

Court's finding of fact, "From the time of its incorporation the Keystone Operating Corporation has been the creature of the defendant company in that it has been the agent and instrumentality of the defendant company, or has been dominated or controlled by it."

In the first part of 1935, American Casualty Company was in serious financial difficulties. Because of that situation it was having trouble with the State Insurance Departments of New Jersey and Pennsylvania. In order to maintain its insurance policies then in force it was required to reinsure those policies. For that purpose, the then officers of American Casualty Company got in touch with the Excess Insurance Company of America with the view of having the latter issue the necessary reinsurance. There were negotiations between the two companies as to a plan. At various conferences, one of which at least was held in the office of the Pennsylvania Deputy Insurance Commissioner at Philadelphia, Excess suggested a general method. The most important part of this was that, as stated in Excess' letter to the president of American Casualty of June 27, 1935, "we are to be vested with the management of the company." (American Casualty Company). The president of Excess in that letter further says: "To complete the plan, our proposal is to assume the complete management of the company's affairs, and by reinsurance, reorganization, the revision of underwriting and claims procedure, the acquisition of new and profitable business which we now control and the installation of a plan for assisting in putting the company in possession of liquid funds, to put the company on a sound and profitable basis."

The letter also states: "To this end, we propose to make no charge for our services, but intend that when we have begun to make a profit for the Company we shall share in that profit and inasmuch as it is possible that for quite a time we will be extending our efforts gratuitously, we will require a contract covering a ten year period. This may seem to be a long stretch, but we have thoroughly canvassed this situation from every angle and are convinced this is the shortest period in which we can do justice to all parties."

Following that, Excess drew a proposed contract which placed the management of American Casualty Company in the hands of a new corporation to be formed, namely, Keystone Operating Corporation. In a letter to the secretary and treasurer of American Casualty Company, by the president of Excess, dated July 12, 1935, appears the following: "Before drafting our original contract, we made a careful study of the condition of your Company and after serious deliberations over what we found, fraught with many misgivings, evolved the contract submitted to you, which when all the circumstances were taken into account, we considered most altruistic."

During the same period Excess was in close touch with the New Jersey Insurance Department and in a letter to the Deputy Insurance Commissioner of that State dated June 27, 1935, Excess advised him "that arrangements are being perfected for us to take over the entire management of the company." (American Casualty Company). Following this, on July 18, 1935, Keystone Operating Corporation was incorporated. Haines, secretary and treasurer of Excess, became president; and Gibbs, the president of Excess, was made a director. An agreement was entered into between Keystone and American Casualty under the terms of which Keystone was to manage and control the activities of American Casualty Company in many matters concerning its corporate business. Keystone immediately thereafter functioned in its capacity as manager for American Casualty. This condition continued through September and November 1935 and for a considerable time thereafter.

During the same period Excess Insurance Company had a similar management arrangement with Atlantic Casualty Company, a New Jersey insurance corporation. It ran the affairs of that concern through a company called Atlantic Management Corporation, which is the plaintiff in the instant case. Haines was also president of Atlantic Management Corporation. During those two months of September and November 1935, Haines, as president of Atlantic Management Corporation, drew three checks on that company to Keystone Operating Corporation. These checks were deposited in the account of Keystone. There is nothing in the record as to what eventually happened to the proceeds of the checks. It is these checks which are the basis of the judgment in the instant suit. Their total, plus interest, is the amount of the judgment against the defendant herein.

On December 28, 1935, there was a bill filed in the United States District Court for the Eastern District of Pennsylvania by stockholders of American Casualty Company alleging that the management contract between that concern and Keystone Operating Corporation was unfair to American Casualty Company and seeking to have the contract set aside as ultra vires. On February 9, 1937 there was a consent decree in that action, setting the contract aside. For all practical purposes, from about January 1, 1937, American Casualty Company controlled Keystone Operating Corporation. The original suit by Atlantic Management Corporation against Keystone Operating Corporation founded on the check items of September and November 1935, was started in the Philadelphia Common Pleas Court September 1936. Plaintiff's statement of claim was filed February 24, 1937. That case was tried March 15, 1939. Final judgment was entered in favor of the plaintiff, Atlantic Management Corporation, on April 27, 1939 for the face amount of the checks with interest, all of which totalled $5,129.57. Thereafter this suit was commenced on that judgment against Keystone by Atlantic Management against the present defendant, American Casualty Company.

All of the above facts appear clearly in the present case. The true situation is contained in the record of the American Casualty Company stockholders' suit against Keystone which is plaintiff Atlantic Management Corporation's own exhibit in evidence in this case. It shows beyond doubt that Atlantic Management Corporation was the creature of Excess Insurance Company from the beginning and during the period when the checks were issued by Haines, the Excess executive, as president of Atlantic Management to Keystone, of which concern he was also president. There is nothing in the testimony or otherwise in this suit, indicating the contrary. Admittedly Keystone was the managing agent for American Casualty. From that and other matters which occurred after November 1935, the conclusion was reached that American Casualty dominated Keystone from the latter's inception. The further element that the real picture was buried in the record of the stockholders' suit, offered in bulk as one exhibit, certainly did not help the Trial Court in endeavoring to arrive at the fundamentals of this very confusing affair.

What actually happened was that American Casualty, in order to remain in existence, was forced to obtain reinsurance to protect its current policies. It, therefore, permitted Excess Insurance Company, through the latter's Keystone Management Corporation, to take over; and it was not until at least the spring of 1936 that American Casualty Company was once more its own master. Instead of American dominating Keystone from the latter's inception through the check transactions' period of September and November 1935, the reverse of the medal was the actuality.

In Lowendahl v. Baltimore & Ohio R. Co. 247 App.Div. 144, 287 N.Y.S. 62, affirmed 272 N.Y. 360, 6 N.E.2d 56, there was a similar suit bottomed on a judgment against another corporation. One of the grounds of the claim was that the judgment debtor company was the dominated instrumentality of the defendant. The Trial Court upheld that theory in finding against the defendant. The Appellate Division reversed, holding that control by the defendant of the debtor corporation did not occur until long after plaintiff's cause of action arose and, therefore, did not justify a disregard of corporate entity. The New York Court of Appeals affirmed the decision of the Appellate Division. The language of the Appellate Division opinion is pertinent here. That Court said on pages 76 and 77 of 287 N.Y.S.: "It must also be kept in mind that the unlawful control must be shown to have been exercised at the time when the acts complained of took place. That, in this case, means on or about November 1, 1929. The importance of this time element was not, we believe, properly considered by the learned court at Special Term. The voluminous evidence introduced showing numerous facts that took place long after November 1, 1929, might, indeed, be considered in so far as it helped to reveal the true nature of the transaction and the real actor in the conveyance of November 1, 1929, but it should not have been considered as determinative of the result in so far as it tended only to show claimed control long after the transaction complained of and having no relation to its consummation."

And again at page 79 of 287 N.Y.S.: "Plaintiff's counsel marshals every fact that can possibly tend to show obtrusive and improper control. But the overwhelming majority of the facts relied on happened, not at the time of the act com-

plained of, but months later, and are, on the whole, so remote in time and pertinency as to afford no evidence of control at the prior and solely relevant time. Even if the evidence established control and domination, from and after May, 1930 * * *, that fact does not predicate liability against the defendants for an alleged fraud claimed to have been perpetrated through defendants' control on November 1, 1929, where it affirmatively appears that in the interval between the alleged fraudulent transfer and the condition beginning in the spring of 1930, at least 4 or 5 months later, material changes had taken place."

The judgment of the District Court is reversed.