## Commonwealth v. Pro-Pak Foods, Inc.

*Harold E. Stambaugh & Herbert S. Cohen,* for plaintiff.

*William D. Boswell,* for defendants.

CALDWELL, J., April 25, 1974.—This matter has been submitted to us for determination on an agreed statement of the issue. The record for the purposes of our decision consists of the pleadings, depositions and the briefs of the parties.

The Commonwealth is proceeding under the Wage Payment and Collection Law of July 14, 1961, P. L. 637, 43 PS §260.1, to recover, on behalf of certain employes, wages admittedly earned by them in the month of December 1971.[1] The question to be decided is whether Mogelberg Foods, Inc. (Mogelberg) was, in fact, the employer of the workers at the time the wages were earned and, hence, liable for the wage claim. The Commonwealth contends that the record permits this conclusion, whereas Mogelberg argues that the employer of the wage earners was Pro-Pak Foods, Inc., a corporation owned by Mogelberg.

The Wage Payment and Collection Law empowers the Secretary of the Department of Labor and Industry to maintain legal actions to collect unpaid wages from defaulting employers. This has been done in this case by a fraudulent debtor's attachment proceeding against Mogelberg Foods, Inc. The wage law provides that "Every employer shall pay all wages due to his

---

[1] The stipulated amount of the wages is $12,592.09, and interest is claimed from January 1, 1972.

employes on regular paydays". section 3. An employer is defined in the act as "[E]very person, firm, [etc.] . . . of this Commonwealth . . . employing any person in this Commonwealth." The Commonwealth asserts that while Pro-Pak Foods, Inc., may have been the employer of record, the real employer was Mogelberg Foods, Inc.

A lengthy annotation of the subject, Liability of Corporation for Contracts of Subsidiary, is contained in 38 A. L. R. 3d 1102, 1111. The article reviews the various theories on which one corporation can be held accountable for the acts of another. The general proposition concerning this area of law is well stated:

"It is clear that taken alone, the fact that one corporation owns all or a majority of the stock of the other, or that the two corporations have common officers and directors, or both, does not render a parent liable on its subsidiary's contract. Beyond this, however, the result becomes less certain; each additional factor tending to show too close or too direct a relationship between the corporations, disregard by one corporation of the normal corporate processes or formalities in regard to the other, or a holding out by one that the other is a department of its business or that it stands behind it, greatly increases the likelihood of imposition of parental liability. In practical effect, the court disregards the separate entity of the subsidiary where the parent has done so, at least in cases where the parent did so in relation to the transaction in suit."

One of the leading cases mentioned in the annotation, and referred to by defendant's brief, is Lowendahl v. Baltimore & Ohio Railway Company, 247 App. Div. 144 (N. Y.), 287 N. Y. Supp. 62, affirmed in 272 N. Y. 360 (1936), where the court outlined the three elements that must be shown to establish liability of

a parent corporation on the "instrumentality" theory, upon which the plaintiff appears to be proceeding:

"Restating the instrumentality rule, we may say that in any case, except express agency, estoppel, or direct tort, three elements must be proved:

"(1) Control . . . but complete domination [by the parent] etc.

"(2) Such control must have been used . . . to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

"(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."

Our courts have indicated that these tests are applicable in Pennsylvania. In Botwinick v. Credit Exchange, Inc., 419 Pa. 65, 213 A.2d 349 (1965), the court said:

"Neither the similarity of names between the parent and subsidiary corporation . . . , nor the total ownership of the stock of the subsidiary by the parent . . . nor the fact that a single individual is the active chief executive of both corporations . . . will per se justify a court in piercing the corporate veil if each corporation maintains a bona fide separate and distinct corporate existence.

"There is a well recognized exception to these general rules if the record demonstrates that the subsidiary is the 'alter ego' of the parent to the extent that domination and control by the parent corporation renders the subsidiary a mere instrumentality of the parent; under such extreme circumstances the parent corporation may be held to be doing business within the state under the facade of the subsidiary."

With these guidelines in mind, it is necessary to review the contents of the depositions. They disclose that Pro-Pak Foods, Inc., was a processor of fish and fish products, and maintained a plant in Steelton, Pa. Although the history of this corporation is poorly documented, it appears that prior to the end of 1970 all of the stock of the company was owned by one Sverrir Magnusson. One of Pro-Pak's customers at that time was Mogelberg Foods, Inc., a New York corporation with offices in Jersey City, N. J. The record does not explain the precise nature of Mogelberg's business but we conclude that it purchased raw fish, had it processed and packed by others, and then sold the finished products. Prior to 1970, there was no connection between these two corporations except for normal business dealings.

For reasons not revealed by the depositions, in the latter part of 1970 Mr. Magnusson transferred or agreed to transfer 50 percent of his stock in Pro-Pak to Bent Mogelberg, an individual who headed Mogelberg Foods, Inc. For reasons and considerations again not known, in June 1971 there was an agreement whereby Mr. Magnusson and Mr. Mogelberg exchanged their stock in Pro-Pak for the stock of Mogelberg Foods, Inc., so that Mogelberg Foods, Inc., would own the stock of Pro-Pak, Inc.[2] From June 1971 until December 1971, Pro-Pak Foods, Inc., continued in the fish processing business until operations were discontinued due to financial failure and the company was unable to meet its last weekly payroll.

Pro-Pak appears to have maintained a separate

---

[2] Apparently, this acquisition was never fully executed, although we will treat the matter as final for the purposes of this case. In December 1971, Mogelberg Foods, Inc., rescinded this agreement, alleging misrepresentations on the part of Pro-Pak as to its financial condition.

corporate identity after Mogelberg acquired its stock. Mr. Magnusson was president of Pro-Pak before June 1971 and remained in this office thereafter. The depositions disclose that the authorized signatories on the general and payroll accounts of Pro-Pak were Pro-Pak's office manager or Mr. Magnusson. The identity of Pro-Pak was maintained in connection with the services it performed for Mogelberg after the acquisition, i.e., Mogelberg would send fish to Pro-Pak on bills of lading with invoices attached, which were paid from Pro-Pak's own account. After processing and packing, it appears Pro-Pak would resell the fish to Mogelberg and receive payment therefor. Mr. Cresci, who was employed as vice president of Pro-Pak in charge of sales, testified that Pro-Pak billed separately and directly for processing done for customers other than Mogelberg. Mr. Cresci also testified that he and/or Mr. Magnusson had final authority to establish selling prices and special contracts made by Mr. Cresci for Pro-Pak. Although Mr. Cresci's employment contract was guaranteed by Mogelberg, he stated that he felt responsible to Mr. Magnusson for performance of his duties.

At a board meeting of the directors of Pro-Pak held in Jersey City, N. J., on October 20, 1971, the profit picture and financial condition of Pro-Pak were discussed and guidelines were formulated to improve working relationships between Mogelberg and Pro-Pak. The minutes of this meeting indicate a concerted effort to maintain the corporate existence and integrity of Pro-Pak. This evidence indicates to us that Mogelberg was attempting to operate Pro-Pak successfully and independently. Pro-Pak retained its own label or trade mark for processing done for others. When selling products with the Mogelberg label, Pro-Pak used its own order forms, etc. Mr. Magnusson was involved

in efforts by Pro-Pak to borrow money, and the corporate structure of Pro-Pak remained the same after it was acquired. A debt owed to Mogelberg by Pro-Pak, Inc., retained its identity and regular credits were applied on the debt from sums owing to Pro-Pak for processing.

The Commonwealth seeks to impose liability on Mogelberg because of its alleged control and domination of the affairs and activities of Pro-Pak subsequent to June 1971. Although there is a showing of certain control and management participation by the same individuals in both corporations, we find nothing in the depositions that would support a finding of mismanagement, or that would justify judicial interference with the well established immunity enjoyed by a shareholder of a corporation. Mogelberg, as the owner, controlled Pro-Pak to a substantial degree, but the record does not permit any inference of improper handling by Mogelberg of the business of Pro-Pak. Unfortunately, the record does not touch upon the financial history or condition of Pro-Pak, so that it is impossible to conclude whether Pro-Pak's failure was predestined, whether its fortunes crumbled because of Mogelberg's influence over its fiscal affairs, or whether it failed for some other reason.

The legal propositions relied on by the Commonwealth are not applicable to this litigation as they deal with negligence claims against an alleged employer. If plaintiff is to succeed, it must be upon the "instrumentality" theory of ignoring the corporate entity and we do not find the prerequisites for invoking that rule. So far as can be ascertained from the depositions, the acquisition of Pro-Pak by Mogelberg was a legitimate transaction. While certain management changes were noted under the Mogelberg ownership, Pro-Pak continued in its usual business of processing fish until the end came. The Commonwealth appears to be pro-

ceeding on the belief that it can prevail merely by showing that Mogelberg dominated or controlled the management or operation of Pro-Pak, Inc. This is an incorrect assumption and, as we have already stated, is not a sufficient basis to impose liability on a parent corporation.

We recognize that the Commonwealth is attempting in this suit to assist the unpaid employes of Pro-Pak, Inc., and we sympathize with their plight. However, we cannot permit this emotion to override accepted and well-established principles of law. The legislature did not see fit to impose liability for wages on a parent corporation in the Wage, Payment and Collection Law, and we cannot do so on some other theory without a proper legal basis in the record.

Although there is general agreement on the legal principles involved in piercing the corporate veil, in the final analysis each case must be decided on the facts of the particular situation. For this reason, comparison to other cases is difficult, but in Union Real Estate Co. v. Robert Morris School, Inc., 111 Pitts.L. J. 291 (1963), the court was faced with a somewhat similar matter. In this case, it was contended that the acquisition of a subsidiary by the parent corporation had been for the sole purposes of eliminating a competitor and defrauding the landlord-creditor of the subsidiary. These allegations, if proved, were sufficient to make the parent corporation liable to the landlord of the subsidiary. However, the landlord could only show that the parent corporation exercised substantial control over the management of the subsidiary. In refusing to impose liability on the parent, the court noted that the parent had made a bona fide effort to operate the subsidiary and that there was no proof of the alleged improper motives of the parent. We believe the situations are similar.

In two cases involving attempts to obtain jurisdiction over a parent corporation by serving its subsidiary, the Eastern District Court held that the evidence was insufficient to show that the subsidiary was the "alter ego" of the parent. In both cases, the court reviewed the extensive management control exercised by the parent corporation in the operation of the subsidiary. These cases illustrate the heavy burden of proof required to invoke the identity theory of disregarding the corporate entity. See Technograph Printed Circuits, Ltd. v. Epsco, Inc., 224 F. Supp. 260 (1963), and Scalise v. Beech Aircraft Corporation, 276 F. Supp. 58 (1967).

We conclude the Commonwealth has not sustained its burden of proof, and we enter the following

## ORDER

And now, April 25, 1974, we find in favor of defendants.