# Commonwealth ex rel. *v.* Kelly et al., Appellants.

*Beneficial associations—Corporations—Quo warranto—Directors —Res judicata—Identity of matter in issue—Parties—Privity— Laches.*

1. In determining whether a prior judgment of a court of competent jurisdiction is res judicata of a pending suit, the inquiry is not always as to the identity of the cause of action, but may at times be one of the matters in issue.

2. In such a determination, identity of persons or parties must not always be viewed as referring to individuals, inasmuch as the judgment is binding not only on the parties but on all who are in privity with the actual parties to the same rights of property.

3. In a quo warranto proceeding to determine the rights of respondents to hold the office of directors of a charitable corporation, elected by a lodge of a beneficial association, the judgment of another state in an equity proceeding between two factions of the association, each claiming to be the legal lodge, is conclusive against the legal existence of the lodge which elected the respondents, where it appears that although the parties in the two proceedings were not the same, they severally derived their authority from the same factions, and that, as the actual subject of litigation was the same, the parties in the quo warranto proceedings were in privity with those in the equity case.

4. In such case, the relators cannot be charged with laches in delaying their proceedings for eight years, where it appears that respondents had themselves instituted proceedings raising the same question which they had not abandoned until a short time before the petition for quo warranto was issued.

5. The question of laches does not depend upon the fact that a definite time has elapsed since the cause of action accrued, but whether, under the circumstances of a particular case, plaintiff fails to exercise due diligence in proceeding to assert his rights.

*Beneficial associations—Disputes between rival factions—Jurisdiction of courts.*

6. The jurisdiction of the courts to determine disputes between contending factions of a beneficial association, cannot be questioned, where it appears that the highest body in the association had jurisdiction over such disputes only when requested to act, and it is shown not only that no such request was made but that there was an express refusal to submit the question in dispute to that tribunal.

Argued April 22, 1926.  Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

Appeal, No. 172, Jan. T., 1926, by defendants, from judgment of C. P. Montgomery Co., June T., 1922, No. 149, on verdict for plaintiff, in case of Commonwealth ex rel. Alexander McClintock et al. v. Albert E. Kelly et al.  Affirmed.

Quo warranto to determine the right to hold the office of directors of the Orange Home, a corporation of the first class.  Before MILLER, P. J.

The opinion of the Supreme Court states the facts.

Verdict and judgment for plaintiffs.  Defendants appealed.

*Errors assigned* were various rulings and instructions, quoting record.

*Samuel A. Goldberg* and *Melvin M. Johnson,* of the Massachusetts Bar, with them *Wolf, Patterson, Block & Schorr,* for appellants.—The admission of the Maryland case as res judicata was the pivotal point of the trial, and, by its ruling, the learned court below erred: Lowry v. Coal Co., 272 Pa. 19; Siegfried v. Boyd, 237 Pa. 55; Moser v. R. R., 233 Pa. 259.

The court erred particularly in admitting the Maryland case because the parties in that case and in this case are not the same: Siegfried v. Boyd, 237 Pa. 55; Lightner's Est., 187 Pa. 237; Baker v. Small, 17 Pa. Superior Ct. 423; Macan v. Belting Co., 264 Pa. 384; Duquesne Bond Corp. v. Surety Co. of New York, 264 Pa. 203; Hatch v. Bartle, 45 Pa. 166.

It is perfectly proper for a national or supreme council in a beneficial association to determine disputes where it is so provided in the constitution and by-laws: Com. v. Heilman, 241 Pa. 374; Acri v. Bruscia, 265 Pa. 384.

Plaintiffs are bound by laches: Derr's Case, 203 Pa. 96; Pittsburgh Rys. Co. v. Boro., 259 Pa. 333; Com. v. Turnpike Co., 153 Pa. 47; Bailey's Est., 241 Pa. 230.

*Walter L. Sheppard,* of *Porter, Foulkrod & McCullagh,* for appellees.—Respondents' claim of title to office, is not res judicata by the so-called Maryland decision.

Those who voluntarily absent themselves from a meeting duly called, must recognize the validity of the acts regularly done by those who have attended: Com. v. Patterson, 158 Pa. 476; So. Pacific R. R. v. U. S., 168 U. S. 1; Rauwolf v. Glass, 184 Pa. 237; Cavanaugh v. Buehler, 120 Pa. 441.

The right of the relators to perform the duties of their offices was not barred by laches: Weiss v. London G. & A. Co., 285 Pa. 251; Loyal Orange Institution v. Morrison, 274 Pa. 302; State Grand Lodge v. Morrison, 277 Pa. 41; Robinson v. Harshaw, 63 Pa. Superior Ct. 482; Dunlap v. Harbinson, 66 Pa. Superior Ct. 564; Lyons v. Phila. etc., Society, 70 Pa. Superior Ct. 575; Loyal Orange Institution v. Morrison, 269 Pa. 564; Potter v. Osgood, 79 Pa. Superior Ct. 397; Montgomery Bros. v. Montgomery, 269 Pa. 332.

OPINION BY MR. JUSTICE SADLER, June 26, 1926:

Relators petitioned for a writ of quo warranto against respondents to determine the rights of the latter to hold and exercise the office of directors of the Orange Home, a Pennsylvania corporation of the first class, which owns and conducts a home at Hatboro, Montgomery County, for the support and care of aged and infirm members of the Loyal Orange Institution of the United States of America, and also for the support and care of wives and widows of members, and education of their orphaned children. The petition averred that relators were a duly elected board of directors of the Home by the Supreme Grand Lodge of the Loyal Orange Institution of the United States, and that respondents were

illegally and without proper authority exercising the powers and duties of directors of the home. The answer denied relators were the duly constituted members of the board of directors of the home or that respondents were acting illegally, but on the contrary averred they were lawful directors elected in accordance with the constitution and laws of the Supreme Grand Lodge of the Loyal Orange Institution of the United States of America, and that they and their predecessors had been in office and had held peaceful possession of the home since 1913. The record discloses two separate factions in the order, the relators being known as the "Kirkland" faction, and the respondents as the "Lemmon" faction. The answer also questioned the right of relators to maintain the action because of their failure to appeal to the Imperial Grand Orange Council of the World to test their standing as members of the organization and averred they were also estopped by their laches in failing to bring an action until the lapse of ten or twelve years after the original breach in the organization occurred.

The facts set forth in the petition and answer, together with the evidence offered at the trial of the case, show the breach in the organization occurred in 1914, at a regular meeting of the Supreme Grand Lodge of the Loyal Orange Institution in the United States, held at the Cataract Hotel, Niagara Falls, New York. The petition avers, inter alia, that at this meeting "a minor faction of the delegates and members neglected and refused to attend the meeting, which was conducted without them," and that the latter assembled at another place and "organized a spurious and illegal meeting." The respondents in their answer, replied in kind, averring in almost identical language that when the convention was convened "a minor faction......became turbulent and disobedient.....and refused to attend the meeting..... which was conducted without them," who then organized a "spurious and illegal meeting." Much testimony

was taken showing what actually took place between the two factions at the convention, and the events leading up to the breach in the order; the trial judge, however, subsequently sustained a motion to strike out this testimony, and admitted in evidence a copy of the record of a proceeding in Baltimore, Maryland, which the court concluded was res judicata of the question here involved, and in which it was decided relators, who represented the "Kirkland" faction, constituted the true and official organization. The court accordingly instructed the jury that the judgment in the proceeding referred to was binding on the parties, and that relators in this case were the properly elected directors of the Orange Home, leaving however to the jury the question whether their rights were barred by reason of their own laches. The verdict was in favor of relators, and respondents' motions for a new trial and for judgment non obstante veredicto, were subsequently overruled. Respondents appealed.

The questions raised and argued in this appeal are, first, did the court below err in holding the decision of the Maryland court to be res judicata of the right of relators to office; second, had the court jurisdiction to determine the case, or was exclusive jurisdiction in the Imperial Grand Orange Council of the World; and, third, were relators guilty of laches in not having proceeded at an earlier date to contest the right of respondents to their office as directors of the Orange Home at Hatboro.

"The general rule is that a judgment of a court of competent jurisdiction is final and conclusive and must be given full faith and credit in other jurisdictions as to all matters in controversy, or which with proper diligence might have been interposed as a defense in the original action: Marsh v. Pier, 4 Rawle 273; Bell v. Allegheny County, 184 Pa. 296; Stilwell v. Smith, 219 Pa. 36; Browarsky's Est., 252 Pa. 35, 41. It is also equally well settled that a judgment is conclusive only

in so far as responsive to the pleadings, and, consequently, in an action brought on a judgment of another state, evidence may be offered to show the subject-matter involved was not included in the proceeding in the foreign jurisdiction, or that the latter court was without jurisdiction of the cause of action or of the party: Reynolds v. Stockton, 140 U. S. 254; Thormann v. Frame, 176 U. S. 350; Price v. Schaeffer, 161 Pa. 530, and cases cited": Hunt v. Snyder, 261 Pa. 257, 259. "To make a matter res adjudicata there must be a concurrence of the four following conditions: (1) Identity in the thing sued for; (2) identity of the cause of action; (3) identity of persons and of parties to the action; (4) identity of the quality in the persons for or against whom the claim is made": Seigfried v. Boyd, 237 Pa. 55, 59. The above language must nevertheless be considered in view of the circumstances there involved and must not be construed so literally as to exclude from its application cases where the thing sued for or the cause of action, though involving some tangible object, is really an intangible right, a determination of which will settle the claims of the parties in another proceeding though a separate object or subject-matter may be involved. The inquiry is therefore not always as to the identity of the immediate cause of action, but may at times be one of identity of the matter in issue: Cavanaugh v. Buehler, 120 Pa. 441, 447. Likewise identity of persons or parties must not always be viewed as referring to individuals, inasmuch as a judgment is binding not only on parties, but on all who are in privity with the actual parties on the record, and who have a mutual or successive relationship to the same rights of property: Strayer for use v. Johnson, 110 Pa. 21. These, and other well settled principles which we need not mention here, must be kept steadily in mind in applying the doctrine of res judicata to each case, to carry out its general purpose, which is not merely to serve the interest of one who may see fit to invoke the rule, but to apply it as a measure of

public policy on the principle that the general welfare requires litigation to come to an end: State Hospital for Insane v. Consolidated Water Co., 267 Pa. 29, 37.

The protracted series of litigation between the two factions which are the parties to this dispute, is a striking illustration of the need for a liberal application of the doctrine above referred to. The split in the organization in 1914 resulted in prolonged and expensive litigation in many jurisdictions, which has been continued to the present time. Various phases of their differences have been brought before our courts, as appears from decisions of both lower and appellate courts. In these various decisions, the "Kirkland" faction, the present relators, have been uniformly successful in maintaining their status as the true official organization. While the facts involved in our own cases were not such as to call for a decision of the questions raised here, the court below decided that, in the Baltimore case, the facts at issue and the questions actually decided were substantially identical with those here involved, and therefore that case was res judicata of the present proceeding. A comparison of the issues raised and the proofs offered in the two cases leads us to sustain this conclusion.

An examination of the record of the Baltimore proceedings shows that complainant in that litigation was the Supreme Grand Orange Lodge of the Loyal Orange Institution of the United States, organized by the "Kirkland" faction, and the defendant the State Grand Orange Lodge of Maryland of the Loyal Orange Institution of the United States of America, organized by the "Lemmon" faction, the present respondents. The bill alleged defendant had been organized by secessionists from the true order, and prayed for an injunction restraining them from continuing to act and use the name of the organization. The answer in turn charged plaintiffs with being secessionists, as in the present proceeding. The issue was thus directly raised as to which of the grand lodges was the legitimate one, and the testi-

mony directed to what took place at Niagara Falls in 1914. Lundie and Wilson joined in the answer as "representatives of the Supreme Grand Lodge of the Loyal Orange Institution of the United States of America." After a full hearing, the court found in favor of the "Kirkland" faction, and against defendants, and in the course of the opinion said: "I am not willing to accept the uncorroborated statement of Mr. Dunlap that he was assaulted at that door [at Niagara Falls], because there was a whole crowd there, men affiliated with him and men not affiliated with him, and he has not produced a single witness who corroborates him when he says that Kennedy [a delegate to the convention] assaulted him and prevented him from entering the assembly room. No one else saw it. It is very strange to my mind that no one saw it who can be produced here as a witness to say, Yes, I saw Kennedy assault him, and that is the reason he did not enter the assembly room. It seems to me that Mr. Dunlap ought to have taken warning from those two decisions of Judge SULZBACHER [SULZBERGER] which were issued on the last day of July and first day of August of that year, of which he undoubtedly must have known and must have read, they being decisions of a court of the jurisdiction in which he lived and in which he was acting at the time that he perpetrated this wrong there adjudicated against him. I know at that time the court of Pennsylvania had not put Mr. Wilson back in office and put Mr. Donaldson out. That did not occur until 1915, but Mr. Dunlap ought to have been more cautious, and he ought to have been made more cautious by what already had happened in the court, because by that time the matter had gotten into court.

"Now the question here is: Which of these contending factions is the legitimate Supreme Orange Order of the United States of America?......

"Mr. Dunlap's duty, it seems to me, and the duty of each one of the men affiliated with him, was to go to that

hall and demand admittance to it.   He was the Supreme Grand Master and he had the charter in his hand.   If he had been driven away, under those circumstances he might have some standing in court.   He did not do that. He withdrew, and it does seem to me that Mr. Dunlap and his friends withdrew for reasons of their own.   I won't go any further than that.   The organization that stayed in the assembly hall, started at nine o'clock A. M. on the morning they were called to meet in convention, and was the legitimate organization of the institution that bears the name of the complainant in this case." At the conclusion of the opinion the following appears: "Mr. Veazey: I should like to ask if there is to be a decree against both defendants.   The Court: Both defendants are in court.   I do not mean those two gentlemen. I mean the entities that they represent."

It thus appears that while the case was not between the same parties as those in the present case, yet the persons there named represented or derived their authority under the same factions or organizations as the parties to the present proceeding.   The latter are consequently in privity with the same factions who were parties to the Baltimore case, and their rights to succession and to the property of the organization were accordingly adjudicated.   The actual contest here, as there, is not one of title to specific property, but to the right to office, which involves the power and authority of the body which elected them.   Those bodies are the same in the present case as in the Baltimore case, even though the immediate parties to the suit were not identical in both proceedings.   They were present in a representative capacity and sued and defended in that capacity.

The testimony offered here as to what took place at the convention hall at Niagara Falls is no more convincing to us than was the testimony in the Baltimore case. Even Lemmon, in testifying for respondent, admitted Dunlap protested against entering the assembly room notwithstanding a number of persons were endeavoring

to persuade him to do so. With the charter in his possession he declined to enter the convention hall, and instead, took the charter and went, with his followers, to another building 10 or 12 blocks distant, and proceeded to hold what they sought to establish as the official convention. We are of the opinion, based on points of similarity between the Baltimore and the present case that the former is res judicata of the present. The real matter in issue in each case was the rights of the respective parties as the true body of the organization. When this question is settled the entire controversy disappears. While there was not complete identity of parties so far as individuals were concerned, they and their respective organizations were in privity with the parent organization upon the standing of which the immediate parties depended for their existence and rights. The individuals acted in each case, not in their own rights, but as representatives of the organizations for which they purported to act. And, finally, there was no proof or contention that they did not have the authority so to act.

As far as the question of jurisdiction of the court is concerned, this question was also raised and decided in the Baltimore case, the court saying: "To my mind there is nothing in the charter of the Imperial Council that has been offered in evidence that justifies the Imperial Council in assuming to pass on any question that is involved in the controversy in this case. I do not think the section to which I have been referred in that charter will admit of such a construction." The section evidently referred to is one which provides that the Imperial Grand Orange Council is to be "recognized as the Supreme Court of the Orange Order and shall deal with all disputes and appeals as between Grand Lodges (not Provincial or State Grand Lodges), and shall have full power of arbitration in such cases, and shall be the supreme arbiter on all questions so referred to it. It shall not, however, interfere with the internal affairs of any grand lodge unless such shall be submitted

to it by request of the Grand Lodge concerned." The supreme council convened at Winnipeg, Canada in 1920, and at that time adopted a resolution inviting the contending Supreme Grand Lodges in the United States to submit their controversy to the council at its next meeting in 1923 for adjudication. Upon receipt of this invitation the "Kirkland" faction by resolution "reluctantly" declined "to appoint a committee with extraordinary powers to meet with the committee said to have been appointed by the Triennial Council until, if the same is then deemed necessary, the courts in the United States shall have decided which is the Supreme Grand Lodge of the Loyal Orange Institution in the United States of America." At the same time it appointed a committee to convey to the council "full and complete information regarding the condition of Orangeism in the United States, referring particularly to the dispute now existing as to which is the Supreme Grand Lodge of the Loyal Orange Institution of the United States of America, and also give full information on the matters decided by the various courts in our Country." The delegates at the Triennial Council however proceeded to adopt a resolution recognizing the "Lemmon" faction as the Supreme Grand Lodge. We find no authority in the charter offered in evidence, giving that body power to decide the question passed upon in absence of a specific request so to do, and especially not against an express refusal to submit the question for decision. The courts therefore had jurisdiction, and, in exercising that jurisdiction, have consistently recognized the "Kirkland" faction as the proper organization.

On the question of laches, relators have not been guilty of undue delay in instituting this proceeding. In 1918 respondents and their predecessors in office, began proceedings by petition asking leave to amend their charter, and at that time the present relators or their predecessors in office made formal answer denying membership and rights of the petitioners in the organ-

ization, and denying their authority to act for the corporation, and further alleging they had attempted to exercise the functions of their office without authority. This directly raised the issue here involved, to wit, which of the two organizations was the proper body in this State. The hearing there was delayed until 1921, and when requested to proceed petitioners stated they had decided not to further pursue their application for amendment, and the petition was withdrawn. This occurred in 1922, and the present proceedings were begun shortly thereafter. Respondents are not now in position to complain that during the time the above mentioned proceedings were pending, relators were guilty of laches in not starting another proceeding in which the identical question would have been raised, hence no ground appears for the contention that they are chargeable with laches in bringing the matter in controversy to an issue. The question of laches does not depend upon the fact that a definite time has elapsed since the cause of action accrued, but whether under the circumstances of a particular case plaintiff failed to exercise due diligence in proceeding to assert his rights: Edwards v. Western Maryland Ry., 268 Pa. 228, 230. The trial judge instructed the jury fully concerning the testimony bearing on this question, and the verdict was justified by the evidence.

The decree of the court below is affirmed at the costs of appellants.