IRVING MARCUS, Plaintiff, *v.* RACHEL MARCUS, Defendant.

Supreme Court, Special Term, Kings County, January 6, 1949.

*Louis Friedman* for plaintiff.

*Thomas Cradock Hughes* for defendant.

F. E. JOHNSON, J. The plaintiff sues for divorce based upon the conduct of defendant in claiming to have remarried and thereafter living with her second husband; the complaint alleges the marriage of the parties to the action in 1934 and that about June 30, 1944, the defendant went through that second marriage ceremony and has since lived with that second husband. It *also* alleges (and defendant denies) that no judgment or decree of divorce has been rendered in favor of either party " by any court of competent jurisdiction in this State or any other territory of the United States."

The defendant pleaded as a first defense that by a decree granted to her in January, 1944, in Nevada, she ceased to be the plaintiff's wife; as a second defense that in a separation action brought prior thereto in this court custody of their child was awarded to her and is being held subject to the terms of that decree; at the trial a third defense was interposed alleging, in substance, an estoppel against the plaintiff to maintain this action.

The issues of fact and law arise out of the defendant's claim that she has a valid decree, and remarried on the basis of it, and also that she relied, in remarrying, upon *inter alia* the statements of the plaintiff that the decree was valid. Plaintiff learned of the decree in the spring of 1944, some months before that remarriage, while he was in the armed services. The summons in this

action is dated December 11, 1947; two children were born of the second marriage, a substantial time prior to the beginning of this action; this action was begun a very substantial period after his discharge from the army.

## PLAINTIFF'S BURDEN OF PROOF UNDER THE COMPLAINT.

There is some confusion, because of loose language in certain decisions, as to plaintiff's burden of proof; these cases might seem to hold that plaintiff has the burden of proof to " disprove " the Reno decree; under our rule of procedure (that the one who alleges must prove) the question may arise: Is he not obliged, under paragraph 9 of his complaint, to assume the burden of showing she has an invalid decree? To answer affirmatively is to excuse her from proving by a proper preponderance the defense she has pleaded (a valid decree) and to obligate him to go beyond the requirements of section 1153 of the Civil Practice Act and rule 277 of the Rules of Civil Practice. He did not *specifically allege* that her offense occurred while she was still his wife, but perhaps that was needless, since his marriage, once shown, is, like any other shown fact, presumed to have continued. It seems better to hold that paragraph 9 is superfluous, and that (as to the complaint) he has met his burden by proving a valid marriage and her subsequent cohabitation with another.

## DEFENDANT'S BURDEN OF PROOF UNDER THE ANSWER.

Under our procedure a defendant pleading a defense has the burden of proving it, so she must prove not only the entry of the decree but that there was jurisdiction of her, and of the action, because she was a domiciled resident of Nevada. She may rest on the decree, and in rebuttal, sustain it, or as here, do both on her direct case.

*No case holds that one who moves to another State to effect a change of domicile must then determine never to leave that State thereafter for another, but to stay there till death.* Successive domiciles may be acquired, and no one is foreclosed from a later change of mind if he decides that he wants to change again; if one's mental attitude and conduct are right and consonant change of domicile is *easy and is neither a long nor a complicated process.* A good faith intention, properly acted upon, is *all* that is needed. No court has said that " the fixed intention of making it his permanent home " (*Pignatelli* v. *Pignatelli,* 169 Misc. 534, 537) is disproved if he *ever changes*

*his mind.* The sane view of what is needed was outlined by VANN, J., in *Matter of Newcomb* (192 N. Y. 238, quoted in *Foote* v. *Foote,* 192 Misc. 270, 274–275).

The facts here distinguish this case from those cited in *Moscowitz* v. *Moscowitz* (66 N. Y. S. 2d 477), *Shannon* v. *Shannon* (247 App. Div. 790, *infra*) and *Selkowitz* v. *Selkowitz* (272 App. Div. 1071, *infra*).

### DEFENDANT'S FIRST DEFENSE.

The claim of the plaintiff, in reply to the proof offered under the first defense, is that there was fraud practiced upon the Nevada court by the false pretense of domicile and residence; all attacks in this State upon judgments rendered in foreign States are on the ground that its court never acquired jurisdiction of the suitor, because of the fraudulent representations of that plaintiff as to the court's jurisdiction.

One who *collaterally* (as here) attacks a judgment rendered in his absence " must prove that there was fraud in the very means by which the judgment was procured ". (CARDOZO, Ch. J., in *Fuhrmann* v. *Fanroth,* 254 N. Y. 479, 482, citing *Mayor of City of N. Y.* v. *Brady,* 115 N. Y. 599, *Ward* v. *Town of Southfield,* 102 N. Y. 287, *United States* v. *Throckmorton,* 98 U. S. 61, and *United States* v. *Atkins,* 260 U. S. 220.) He also said that the " rule is less rigid " if the attack is *direct* — namely *in* the action itself (pp. 482–483).

The plaintiff's right to attack the decree by exposing the *falsity of the factual representations* or the *claims of domicile* is an attack " based upon fraud in its procurement." (*McCarthy* v. *McCarthy,* 179 Misc. 623, 626, citing *Hunt* v. *Hunt,* 72 N. Y. 217, *Hall* v. *Hall,* 139 App. Div. 120, and 34 C. J., Judgments, § 815.) The *McCarthy* case (*supra*) has been affirmed (268 App. Div. 1070). (See, also, cases cited in *Shuart* v. *Shuart,* 183 Misc. 270, 272, beginning with *Matter of Lindgren,* 293 N. Y. 18, on the attack for *fraud.*)

What constitutes sufficient *proof* of fraud in these cases has not been defined by the United States Supreme Court. (*Meyers* v. *Meyers,* 179 Misc. 680; *Reese* v. *Reese,* 179 Misc. 665, 667.)

The items of *fact* on which, by his fraud charge, plaintiff has undertaken to give such proof (as indicated in the *Shuart* case, *supra*) are:

There was no " *actual* " domicile, no " *genuine* " intention, no harmony between *intentions and conduct,* the stay was

*" brief "*, a *" sham "*, a *" mere pretense "*, not *" bona fide "*, *" purely fictitious "*, a *" simulated domicile "*, a *" temporary abode "* for the *sole* purpose of a decree.

The charges of fraud here, as far as said to be supported by the plaintiff's own testimony or alleged admissions are met by her denials, and under the circumstances and background existing here one claim is not substantially different from the other in its *inherent* probability or surface truthfulness.

The first defense, that there was a valid foreign decree, would be established by offering the decree and resting; there could be no denial that there was such decree, so the obligation of the plaintiff would be to then give new matter, going behind the decree, and while admitting its rendition, to attack the *power of that court to render any decree* by showing it was defrauded into the belief that it had jurisdiction of the suit when, in fact, the suitor had gone to that State for the *sole* purpose of getting a decree, and had not *intended* to become a resident, and did not, in fact, actually become one, and had no real *domicile* but only the *appearance* thereof. This proof cannot be described otherwise than as a claim of fraud and the proof thereunder must prove fraud. This plaintiff comes under a rigid rule as to the quality and quantity of proof of *fraud* sufficient to avoid this decree; it is required of the plaintiff, in this separate controversy concerning that jurisdiction, to offer a high degree of proof that the decree was procured by *fraud*.

The present position of the defendant in the case is, therefore, that she has a decree which is prima facie a complete answer to the underlying claim of the plaintiff set forth in his complaint (i.e., her *continued* marriage to him). When the decree is offered it is a direct statement to the contrary on that point, and obligates the plaintiff to show that the implication marriage *has* continued, by getting rid of the decree; this result can be achieved only by showing that it was procured by *fraud*. Perhaps what he has done here is part of his burden of proof under his *complaint,* or perhaps it is his burden of proof in his *attack* on her defense, as distinguished from the burden of proof that he has as a plaintiff.

To summarize, the question is: It being conceded that the parties duly married, and that thereafter the defendant went to live with the other man, is her conduct wrongful, and such as to warrant a decree of divorce, if she offers the decree of the Nevada court, issued prior to the cohabitation? At that point the answer is no. The further proceedings in the action on

behalf of the plaintiff, both in cross-examining her, and obtaining admissions, or testifying in his own behalf against the decree, raised the second question: Has *she* proven, by preponderance of evidence, that she has a valid decree?

If the test on that second question is the success of plaintiff's *fraud* attack (on which some of the authorities seem to erroneously indicate *he* has a burden of proof) the third question is: Has he shown, by the required weight of proof (outweighing hers *and the decree*) that it was fraudulently procured?

## THE QUALITY AND QUANTITY OF PROOF REQUIRED OF PLAINTIFF, WHO CHARGES FRAUD IN PROCURING THE DECREE.

There seems to be no distinction in this State between charges of fraud in one type of civil case and those in another. It is a commonplace that one faced with a foreign decree, which he claims was procured by the *pretense* of domicile and the dishonest claim to true residence, must show that the court granting it was deceived into the erroneous belief that the suitor was a domiciled resident of that State; all our cases speak of such false pretense as *fraud*.

" Fraud must be established by clear, positive and convincing evidence. (*Karpas* v. *Brussel,* 217 App. Div. 550, 554.)" (*Balboa Realty Co.* v. *Brenglass Realty Corp.,* 147 Misc. 602, 604.)

" The general rule is that fraud ' which is criminal in its essence,' and involves moral turpitude at least, is never presumed, but must be affirmatively proved  *  *  *  [and] must be established by clear and convincing evidence, by clear, satisfactory, and convincing proof, by clear, unequivocal, and convincing proof,  *  *  *  by strong, cogent, and convincing evidence, by evidence of such a nature as to impel the mind of a reasonable man to a conviction of the truth of the charge." (27 C. J., Fraud, § 170, p. 44; § 199, pp. 63–64, citing *Schumaker* v. *Mather,* 133 N. Y. 590; *Morris* v. *Talcott,* 96 N. Y. 100; *Jaeger* v. *Kelley,* 52 N. Y. 274; *Grosjean* v. *Galloway,* 64 App. Div. 547.) Corpus Juris Secundum (Vol. 37, Fraud, § 94, p. 400) says: " Where a transaction is capable of two constructions, one of which is honest and the other is fraudulent, or where the facts are equally consistent with honesty and with fraud, fraud will not be presumed and the transaction should be held honest ", citing *Burstein* v. *Cohen* (188 N. Y. S. 812).

There must be " clear and convincing factual proof " (*Lowendahl* v. *Baltimore & Ohio R. R. Co.,* 247 App. Div. 144, cited

and followed in *Lynch* v. *Gibson,* 254 App. Div. 47, 51); one must show " *clear* proof of actual fraud " (*Hill* v. *International Products Co.,* 129 Misc. 25), and a " reasonable degree of *certainty* " (*Darling* v. *Klock,* 33 App. Div. 270). Fraud is to be inferred only from " clear proofs " and the other party begins trial with the presumption of innocence; " the presumption of honesty prevails, unless overcome by *irresistible* evidence " (*Snow* v. *Wathen,* 127 App. Div. 948, opinion of referee in 112 N. Y. S. 41, 44).

Those who impugn such decrees are not to succeed by any mere " fair preponderance "; they must do far more. They must present proof meeting the tests indicated by the few cases on the subject; this defendant's evidence *plus the decree* will protect her remarriage unless plaintiff's " countervailing evidence ", or her admissions, etc. " *satisfies* the court " that " error was committed " by the Nevada court (*Selkowitz* v. *Selkowitz,* 272 App. Div. 1071, *supra*); that countervailing proof must be such as " *establishes* " lack of jurisdiction (*Dalton* v. *Dalton,* 270 App. Div. 269, 270, citing *Matter of Holmes,* 291 N. Y. 261). The decree " is entitled to respect, and more. The burden of undermining the verity which [it] import[s] rests heavily upon the assailant " (2d *Williams* v. *North Carolina* case, 325 U. S. 226, 233–234); there must be " a factual *demonstration* of its invalidity " (*Pereira* v. *Pereira,* 272 App. Div. 281, 287); the attack must " *overthrow* the apparent jurisdictional validity * * * by *disproving* [her] intention to establish a domicile " in Reno (*Matter of Franklin* v. *Franklin,* 295 N. Y. 431, 434, citing 2d *Williams* case, *supra;* all emphasis supplied).

Justice MURPHY indicated how heavy and powerful must be the evidence needed to destroy the decree when he spoke of its " constitutional sanctity "; (see quotation from *Williams* opinion, *supra*, p. 242, in *Howard* v. *Howard,* 187 Misc. 16, 18).

In *Caldwell* v. *Caldwell* (298 N. Y. 146, 149–150) CONWAY, J., speaking of a sister-State decree said that it " is valid unless and until attacked by collateral evidence that the plaintiff was not in fact domiciled in the sister State at the time of its rendition." Prior to such collateral attack the judgment establishes a finding of " *actual residence* * * * and also of the *added mental ingredient* necessary for the jurisdictional finding of domicile." (Emphasis supplied.) It is apparent how substantial and impressive must be the evidence in that collateral attack.

In Federal Code Annotated (Vol. 1) are the following annotations to section 1 of article IV of the Federal Constitution:

The full faith and credit clause is an inexorable command. The function of the clause is to resolve controversies where State policies differ. The full faith and credit to which a judgment is entitled is the credit which it has in the State from which it is taken. (*Morris v. Jones,* 329 U. S. 545, revg. *sub nom. People ex rel. Jones v. Chicago Lloyds,* 391 Ill. 492.)

It was intended to provide the means of giving to the judgment of the other State the conclusiveness of a judgment on the merits (*McElmole v. Cohen,* 13 Pet. [U. S.] 312). It makes the record of a judgment conclusive evidence, in courts of another State, of the matter adjudged (*Wisconsin v. Pelican Ins. Co.,* 127 U. S. 265). It is the obligation of the State courts hereunder to submerge their own public policy at the behest of the United States Supreme Court (*Russo v. Russo,* 62 N. Y. S. 2d 514). It preserves the conclusiveness of that judgment as evidence of the thing adjudicated (*State v. Parker,* 144 La. 212; *Douglass v. Gyulai,* 144 La. 213). Where a judgment is conclusive between the parties in the State where rendered it is also conclusive in all other courts in the United States (*Christmas v. Russell,* 5 Wall. [U. S.] 290). Conclusiveness of the judgment extends to all matters that might have been adjudicated (*Commonwealth ex rel. McClintock v. Kelly,* 287 Pa. 139).

(Portion of opinion here omitted as being of subordinate importance.)

### THE EVIDENCE IN THE RENO COURT.

The stenographer who took the testimony is dead, but *when* he died is not clear; where his notes are, and were they transcribed is not stated; what effort was made *after* the *plaintiff came out of the army, and years before he brought this suit,* to find out *what evidence of jurisdiction* was *given to the Reno court,* is not apparent; how can it be said that what she says *now* proves that the Reno court did not have jurisdiction, *when nobody professes to know what was before the Reno court in 1943, when it decided that it did have jurisdiction?* Who testified on that subject? What was said? Were any documents submitted? Was any collateral data submitted or considered? This record is silent. No one asked her *what she testified to;* no one says the judge is dead; no one has asked her lawyer what she said, or asked her to waive his privilege; the plaintiff seems willing to have that subject ignored. The consequence, however, is that the plaintiff's attack on this

decree has come down *entirely* to what *she has said in this court* about what she did after she left New York. There is nobody who quotes her as having said a word in Reno inconsistent with her claim of real residence; no one describes her conduct in Reno as being otherwise inconsistent with her claim though there are people in Reno who plausibly could be expected to know about that. She must, in the many months she was there, have opened her mouth about her affairs to someone but no inquiry seems to have been made to find out if she ever said anything on the subject. The silence of the plaintiff's case on that may be wise, because asking people who might give you an undesired answer might be dangerous; plaintiff's attack on the decree seems open to the criticism that no attempt has been made, *directly or indirectly, to quote any Reno witness to the contrary of the defendant's version.* The letter from plaintiff's Reno lawyer not only is not impressive, because of certain details, but it is more than offset by the telegram of the woman whom he purports to quote; his version of what she said to him over the telephone ought not to be valued in the face of her telegram, especially since she is still a public official. *The entire case against this decree must be found within the testimony of the defendant herself. Plaintiff's case must come down to this: The decree is proven by her testimony to be based upon a lack of jurisdiction and a fraudulent pretense thereof.*

### DEFENDANT'S THIRD DEFENSE.

In substance, it is a charge of " unclean hands " and a plea of estoppel based upon plaintiff's attitude and statements concerning the validity of the decree.

Whatever may have been the growth of the present doctrine that equitable estoppel may be invoked in matrimonial actions (see history of that growth in *Bays v. Bays,* 105 Misc. 492), the doctrine is now established. A case in point because of similar facts has not been found, but a test of an estoppel seems to be the change of position on the part of the one pleading it, based upon words or conduct by the other, in reliance upon which the pleader remarried.

The failure of a husband to *act* after knowing that he had rights, and his laches in allowing those rights to appear non-existent, were considered in *Taylor v. Taylor* (63 App. Div. 231); DAVIS, J., in his opinion in *Bays v. Bays (supra,* p. 502) says that Taylor was defeated on " equitable grounds."

The failure of a husband to act consistently with his belief as to his wife's status was said by our Appellate Division to prevent his having clean hands when he came into equity against her (*Stokes* v. *Stokes,* 128 App. Div. 838). This application of the doctrine to the husband's apparent acquiescence was not disproved on the appeal to the Court of Appeals (198 N. Y. 301, 312; see, also, comment in *Bays* v. *Bays, supra,* p. 503, by the Justice who later became a member of our Appellate Division).

A husband who by his conduct tacitly represented that he was free to marry when he knew he was not, lacked the clean hands that are necessary when he sued his second wife. (*Berry* v. *Berry,* 130 App. Div. 53, 57, 59; see analysis of that case in *Bays* v. *Bays, supra,* pp. 503–504.)

In *Brown* v. *Brown* (153 App. Div. 645) no equitable defense was pleaded, but since the marriage which the plaintiff entered into when she knew it was bigamy was absolutely " void," no question of the application of an equitable doctrine could exist.

*Shannon* v. *Shannon* (247 App. Div. 790, *supra*) is not against defendant; the estoppel with which Mrs. Shannon sought to bind her former husband related to an absolutely void (Mexican) decree, and, by analogy to the principles applied in *Brown* v. *Brown* (*supra*), the majority opinion in the *Shannon* case (*supra*) seems correct. There is surely a vital distinction between a divorce decree that cannot *under any circumstances* be accepted as valid in this State and one that *could* be valid; prior to the *Shannon* case our Appellate Division (*Matter of Alzmann* v. *Maher,* 231 App. Div. 139) had anticipated the Court of Appeals ruling in *Querze* v. *Querze* (290 N. Y. 13) holding Mexican mail-order divorces to be utterly void. It is contrary to all our conceptions of jurisdiction that a court can have jurisdiction of a suit brought by a person who not only does not reside in the country of the court, never went there personally, but has never been subject to the court's jurisdiction by any of the tests that are fundamental in our law on the subject of residence, domicile or jurisdiction. It would be violative of all sensible and established ideas of jurisdiction to permit an unseen, unknown, absent, nonresident to give a court jurisdiction of himself by writing a letter from the country where he has always lived and been domiciled, with the intention of *thereby* making himself subject to the jurisdiction of that foreign court. That fantastic attempt to create the basis from which anyone could infer jurisdiction is so completely absurd that it would be a reproach to the law, and to

legal thinking, if it could be for a moment tolerated that one might, under such circumstances, place himself under the jurisdiction of a foreign court when he was neither a citizen, visitor, resident or domiciliary. Under the circumstances the Mexican divorce in the *Shannon* case was so completely a nullity, and so utterly unreal and nonexistent, that the law would stultify itself by pretending that such an alleged decree was worthy of sufficient consideration to need the application of equitable doctrines to defeat it. What was said, therefore, by our Appellate Division in the *Shannon* case must be read in the light of the *kind* of decree there faced with, and should not seem to be a barrier to the application of any legal principle to a decree of a *sister State*. Then, too, the *Shannon facts* were vitally different.

The conduct of one who may not be bound by the decree, because it was obtained in another State without his appearance, co-operation or consent, need not be of any particular nature to constitute an estoppel if his conduct, etc., can be found, factually, to have been the basis of the change of position by his claiming ex-wife whereby, in reliance upon his words or conduct, she remarries upon the strength of the decree. In *Kelsey* v. *Kelsey* (204 App. Div. 116), the husband against whom the estoppel was applied had no *valid* decree against him, because at that time (long prior to the *Williams* case, *supra,* and while *Haddock* v. *Haddock,* 201 U. S. 562, was the law) his wife's decree was deemed worthless in his own State; but he married thereafter and that act was regarded as a course of action so opposite to the one later taken by him in his New York suit that he was denied relief. It should be noted that it was not claimed by his ex-wife that he had said a word about her decree, or otherwise misled her, but the case is an illustration of the kind of conduct that one, against whom no binding decree is outstanding, may find costs him his equitable right to attack it.

### DEFENDANT'S BURDEN OF PROOF.

The extent of the obligation of the plaintiff when attacking such a decree can be judged from the fact that to the weight and value of the *facts* found, is added an *imponderable.* No court seems to have described the weight to be given to such a decree; it is unique in that the public policy of the United States has given to the decree of a State court all the force and effectiveness that language can give. Each State being a sovereign,

and the United States a collection of sovereigns, there is equality of treatment demanded of each by all.

That constitutional mandate has no parallel in our jurisprudence and while jurisdiction is always a *fact,* and is dependent on *facts,* the mandate frowns on light treatment of that solemn *factual decision* of the highest court of a sovereign State.

### CONCLUSIONS.

The following seem to be the natural and reasonable results of an attempt to work out, by logical processes, and the application of the probabilities, and the weighing of expectable human reactions, and the probable conduct of public officials and the expectable intellectual honesty of justices of the Reno court:

(1) The plaintiff is (in this particular case) unworthy of belief, and nothing that he has said should have respect unless corroborated; he has said nothing of importance for which there is the slightest corroboration.

(2) The defendant's intellectual limitations, the length of time involved since the occurrences, her natural disinclination to remember the plaintiff or anything connected with him, and the probable resultant obliteration of details from her memory not only indicate no prepared scheme to build up a case, or a calculated accumulation of facts for future use; taken as a whole her version seems a respectable and understandable human document, built mostly on the personality and the mentality of an average woman (with some of the limitations of her sex) handling her own affairs, and doing it without conspicuous success because of the fact that she is not intellectually equipped to do well and skillfully things that she, nevertheless, by instinct or intuition, did not do badly.

(3) That she reacted with emotional intensity against the life she was compelled to live under plaintiff's weekly offensiveness, practiced on her each time that she brought the child to see him, fitting in perfectly with the kind of conduct the Supreme Court denounced when it separated him from her.

(4) That whatever she may have hoped, in the back of her mind, the future might have there was no arrangement to marry when she left New York, and she had sense enough to know that her lawyer husband (who would not let her be divorced, who never gave up the hope that he could recover her affection) would block a " fake " Reno decree, and that she had better not get one.

(5) That she went away honestly, a young woman willing to face the future and take care of herself, with no intention to return any more than any woman who "burns her bridges" and lets the future answer the question of what will happen next.

(6) That Reno offered a financial and personal future that was not visible here; she had previously taken her courage in her hands to violate our Supreme Court order, and take her child out of the jurisdiction; *and she probably had sense enough to know it was dangerous to come back.* In Reno, *beyond the reach of this court,* she was like a fugitive from justice who had better stay *outside* of New York if she valued her freedom; if she had peace there, and the *sole* possession of her child, and was young enough to have a future, and was competent enough to earn money, and could rely upon acquiring the *right* to ask the Reno court to get rid of the nightmare under which she had been living, she would be acting like an ordinarily sensible woman, under the circumstances, if she asked for her freedom when it was grantable.

(7) That she did these things, under those circumstances, intelligently but not sufficiently skillfully to prevent all the questions that have been fairly asked her in this trial; but that very lack of finesse, which is evident in the record of her life, ought to be taken as proof of honesty rather than anything else, so that wherein she may have failed turns out to have been beneficial. The presumption of regularity requires finding that some official inquiry was made in Reno as to her right to absentee ballots and that the mailing of them was based on an official decision in her favor of that question and the actuality of her residence and domicile, and her right as a voter.

(8) That she came back solely because she could not, in justice to her child, refuse to let the child see her father (who might never come back) and she intended to go back to Reno. It seems improper to say that she counted on coming back to a jurisdiction where he might so easily obtain a contempt citation against her and even, as the result of her conduct, *obtain full custody of the child.* It seems almost certain that after this court had emphasized the original decree and refused her request to change the provision (that she must keep the child in New York) it would take the child from her if she had been found here after so many months of violation. Common sense would indicate that she had no intention of risking that, and when she did risk it, it was a choice of evils; coming back at all, and risking both the loss of the child and her own

freedom, seems to prove that she was not acting under legal guidance. When, having come back, she remained here (*as the Supreme Court judgment required her to do*) ought not to be used against her as evidence of her original intention to come back as soon as she had a decree. This proper conduct, in coming back, is now used against her as evidence of her having falsely pretended to the Reno court that she was not coming back; the whole episode, at the worst, is only equivocal.

(9) There seems to be no significance in her failure to notify the plaintiff of where she was after she arrived, or what she intended to do, or her change of mind, as to the future; his continued silence thereafter (though he undoubtedly soon knew of the marriage) harmonizes with the inference that he had reconciled himself to losing her, and that even he saw no grounds for attacking the decree.

(10) The substantial time that elapsed between his return to the United States and the service of the summons herein, being also a period of complete silence, is further indication of his acquiescence in what she had done and seems corroborative of her statements that he admitted that she had obtained a good decree and that only by remarrying her could they validly resume life together. This belief, on the part of a lawyer of his alleged experience with the involved legal questions that arise in such cases, ought to be taken at its full value, both in determining the factual question as to what *were* his representations to her and in throwing light on the motives that caused him, belatedly, to bring this suit. Those motives may illuminate his state of mind, and throw light upon how far he will go to carry out his present purposes; perhaps, also, on whether he has come into court with clean hands *if* his only motive is to punish, and seek revenge and do damage.

(11) That substantially all that she quotes him as having said, or written, before and after she went to Reno, in support of the claim that she had a good decree, is found to be true; he did not have the private state of mind as to the proceedings which he now claims, but had a state of mind, of which the letters are a consistent and reliable indication; that state of mind grew out of the arrangement under which she signed the writing; in order that he might not lose *his* rights thereunder he, silently, agreed to her having similar rights after she started for Reno.

(12) That after September, 1943, when he learned of her having retained counsel, his whole line of conduct while she was in Reno is not only consistent with her version of his alleged

later statements, but is inconsistent with his present claim as to what was his true mental attitude, and his present version is rejected as factually untrue.

(13) That she relied both on what he said, and did; his letter-conduct, and forbearing to act, and being silent over the years, is both evidence and corroboration of his alleged admission that the decree was good; that believing his statements to that effect, and accepting his consistent conduct in relation thereto, she married again, and continued to live with the second husband, and become the mother of two children in the belief that the marriage was not only legally binding but that her husband had said it was and was thereafter continuously acting consistently with that statement.

(14) That to believe now the testimony of the plaintiff at this late stage of the creation of new factors, new rights, new duties, and two new lives, would be to give equitable relief (the invalidation of the decree) to one who is not seeking it with " clean hands," and who is estopped to attack it by reason of all of the foregoing and because her change of position was in reliance upon his statements and conduct; he permitted and encouraged her conduct; the things that he said, or did not say, in his letters when he knew she was seeking a decree warrant factual findings contrary to his now false statements. Such conduct on his part is an estoppel, not only because of his inexcusable laches, but because of the apparent motives that caused him to needlessly wait these years and now bring a suit of no possible benefit to him, and of which the only consequences will be destructive; all of this is an opposite of the " clean hands " that are required of one who seeks equitable relief.

An equitable estoppel arises where the conduct of the one to be estopped (by affirmance, ratification or acquiescence) " precludes [him] from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him." (31 C. J. S., Estoppel § 107, citing cases.)

It also applies " where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced * * *." (31 C. J. S., Estoppel, § 107, citing cases.)

" Passive encouragement " (31 C. J. S., Estoppel, § 108, p. 343) may estop — as here, where his letters indicated he would not oppose her divorce action, and he neither replied to the lawyer's September letter nor communicated with the plaintiff or the court *after* being served months later.

The defenses are proven by a preponderance of credible evidence and judgment will be rendered in accordance with the foregoing.

### ADDITIONAL COUNSEL FEES.

The application was timely (*Turner* v. *Woolworth,* 221 N. Y. 425).

In the cases cited by plaintiff (*Loffredo* v. *Loffredo,* 226 App. Div. 746; *Fisher* v. *Fisher,* 223 App. Div. 19; *Stevens* v. *Stevens,* 214 App. Div. 785) no application was made till *after* the trial was over.

Motion granted as to services rendered on and after the motion day, and $150 allowed.

Settle judgment on notice.